UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

MICHAEL G. CARUSO,

                              Plaintiff,                    **REPORT**
        v.                                                    **and**
                                                    **RECOMMENDATION**

SAMUEL A. CAMILLERI,                              **04-CV-167A(F)**
VILLAGE OF KENMORE,
VILLAGE OF KENMORE POLICE DEPARTMENT,

                              Defendants.


APPEARANCES:        BARTLO, HETTLER & WEISS
                    Attorneys for Plaintiff
                    PAUL DAVID WEISS and
                    YVONNE S. TRIPI, of Counsel
                    22 Victoria Boulevard
                    Kenmore, New York 14217

                    BOND, SCHOENECK & KING, PLLC
                    Attorneys for Defendants
                    ROBERT A. DOREN and
                    MARK A. MOLDENHAUER, of Counsel
                    40 Fountain Plaza
                    Key Center, Suite 600
                    Buffalo, New York 14202-2200


### JURISDICTION

        This case was referred to the undersigned by the Honorable Richard J. Arcara

on May 6, 2004, for all pretrial matters, including report and recommendation on

dispositive motions.  The matter is presently before the court on Defendants' motion for

summary judgment (Doc. No. 105), filed on February 16, 2006.

## BACKGROUND

Plaintiff Michael G. Caruso ("Caruso" or "Plaintiff") commenced this employment discrimination action on March 15, 2004, alleging that Police Chief Samuel A. Camilleri ("Camilleri"), the Village of Kenmore ("the Village") and the Village of Kenmore Police Department ("the Department") ("Defendants"), together, placed Plaintiff on a forced, unpaid leave of absence for failure to complete a training exercise, denied Plaintiff's request for a light-duty accommodation instead of unpaid leave, retaliated against Plaintiff for filing an employment discrimination charge against Defendants with the Equal Employment Opportunity Commission ("EEOC"), condoned a hostile work environment against Plaintiff, and caused Plaintiff to suffer pecuniary losses, pain and suffering, and emotional distress based on his alleged disability, morbid obesity. Plaintiff's employment discrimination, retaliation, and hostile work environment claims are asserted pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12101 *et. seq.*, ("the ADA"), and New York Human Rights Law, N.Y. Exec. Law § 296, *et. seq.* ("the NYHRL").

Defendants' motion for summary judgment is supported by a Statement of Facts (Doc. No. 106) ("Defendants' Fact Statement"), the Affidavit of Maureen Qualey (Doc. No. 107) ("Qualey Affidavit"), Defendants' Memorandum Supporting Summary Judgment (Doc. No. 108) ("Defendants' Memorandum"), and the Affidavit of Robert A. Doren (Doc. No. 109) ("Doren Affidavit") with attached exhibits ("Doren Affidavit Exh(s). ___"). On February 16, 2006, the court granted Defendants' request to manually file a videotape. (Doc. No. 110) (Doren Aff. Exh. 3) ("Defendants' motion"). In opposition, Plaintiff filed, on February 16, 2007, Plaintiff's Memorandum of Law (Doc. No. 141)

2

("Plaintiff's Memorandum"), a Statement of Facts (Doc. No. 136) ("Plaintiff's Fact Statement"), the Affidavit of Paul D. Weiss (Doc. No. 137) ("Weiss Affidavit"), the Affidavit of Michael Caruso (Doc. No. 138) ("Caruso Affidavit"), the Affidavit of G. Thomas Haney (Doc. No. 139) ("Haney Affidavit"), and the Affidavit of Kimberly R. Smith (Doc. No. 140) ("Smith Affidavit").   In further support of summary judgment, Defendant filed, on February 28, 2007, a Reply Memorandum of Law (Doc. No. 147) ("Defendants' Reply"), and the Supplemental Affidavit of Robert A. Doren, Esq. on February 28, 2007 (Doc. No. 148) ("Supplemental Doren Affidavit").   Oral argument was deemed unnecessary.

## FACTS [1]

Plaintiff began working as a police officer for the Village of Kenmore Police Department ("the Department") in 1990, in which capacity he is currently employed. Defendants' Fact Statement ¶ 2.  Plaintiff, who is 5'11" tall, allegedly weighed approximately 260 pounds when he began his employment with the Department, which, according to the Body Mass Index ("BMI") table, is not considered morbidly obese. [2] Plaintiff's Fact Statement ¶ 2 (citing Weiss Affidavit Exh. 2, Merck Manual and BMI table).  In the Complaint, Plaintiff represents that he weighed 280 pounds when he began working for the Village of Kenmore Police Department.  Complaint ¶ 12.

---

[1] Taken from the pleadings and motion papers filed in this action.

[2] "Morbid obesity is defined as being more than 100 pounds over ideal weight or 200 percent greater than IDEAL WEIGHT."  R. Ausman & D. Snyder, MEDICAL LIBRARY, LAWYERS EDITION, vol. 8 (1991), § 20:53. The Body Mass Index ("BMI") is one standard by which ideal weight is measured.  Id., THE MERCK MANUAL (18TH ed. 2006) ("THE MERCK MANUAL"), pp. 56-61.

However, shortly after Plaintiff became employed with the Department, on April 23, 1991, Plaintiff weighed approximately 321 pounds, according to Defendants. Defendants' Fact Statement ¶ 90 (citing Doren Aff., Exh. G ("Dr. Penepent Deposition") at 15, 19-20, 34, 41-43).  On December 29, 1994, Plaintiff weighed more than 350 pounds.  *Id.*

In July of 1996, Camilleri, then the Assistant Chief of the Department, informed Plaintiff that the Department was concerned about Plaintiff's "health and ability to perform the physical aspects" of a Village patrol officer based on Camilleri's personal observations of Plaintiff (i) breathing heavily upon ascending a flight of stairs; (ii) always leaning against something; (iii) experiencing difficulty bending over to pick up items; and (iv) displaying difficulty exiting his police vehicle.  Defendants' Fact Statement ¶¶ 91, 98; Defendants' Memorandum at 20-21.

On July 12, 1996, Camilleri directed that Plaintiff undergo a physical exam, in accordance with Section 72 of the New York Civil Service Law ("Section 72"), [3] to assess his ability to perform the physical tasks required of a police officer.  Defendants' Fact Statement ¶ 91; Defendants' Memorandum at 20.  Camilleri agreed to assign Plaintiff to "light duty" work if the examining physician determined that Plaintiff suffered from a medical condition until such condition improved.  Defendants' Fact Statement ¶ 93; Defendants' Memorandum at 20.

On or about August 1, 1996, Plaintiff's primary care physician, Dr. Philip A.

---

[3] Section 72 permits a civil service employer who believes an employee cannot perform his or her job duties because of a disability to require such employee to undergo medical examination by a medical examiner selected by the civil service department or municipal commission.  N.Y. Civ. Serv. Law § 72 (McKinney's 2007).

Penepent, Jr. ("Dr. Penepent") determined that, despite his being overweight, Plaintiff was capable of performing the duties of a patrol officer, but did not diagnose such overweight condition to be caused by a medical condition.  Weiss Affidavit, Exh. A ("Camilleri Deposition") at 440; Defendants' Fact Statement ¶ 96. Shortly thereafter, Dr. Penepent sent Camilleri a written report of his findings.  *Id.*  Based on Dr. Penepent's report, Camilleri instructed Plaintiff to undergo a physical examination, pursuant to Section 72, by a physician, Dr. John Grippi, retained by Defendant to determine if Plaintiff was physically fit to carry out his duties.  Camilleri Deposition at 441-42; Doren Affidavit, Exh. 9 ("Dr. Grippi Letter to Camilleri").  In the cover letter Camilleri sent to Dr. Grippi requesting Plaintiff's examination, Camilleri expressed frustration about veteran police officers who are not required to maintain their physical fitness to the degree required of entry level officers.  Camilleri Deposition at 439-40; Weiss Affidavit Exh. 9 ("Deposition Exh. 77"); Doren Affidavit, Exh. 9 ("Camilleri Letter to Dr. Grippi").

On August 21, 1996, Plaintiff was examined by Dr. Grippi who determined, consistent with Dr. Penepent's findings, that no medical condition precluded Plaintiff from performing his job duties without restriction, but recommended that Plaintiff gradually reduce his weight by diet and exercise to safely execute the job duties of a patrol officer; neither physician described Plaintiff as morbidly obese.  Defendants' Fact Statement ¶ 94; Weiss Affidavit, Exh. E ("Dr. Penepent Deposition") at 41-43, 52-53; Dr. Grippi Letter to Camilleri.   Upon receiving Dr. Grippi's medical evaluation of Plaintiff, Camilleri permitted Plaintiff to continue as a patrol officer so long as Plaintiff appeared capable of carrying out his duties.  *Id.*  At that time, Plaintiff informed Camilleri that he was working with a fitness instructor at a local fitness center ("the

center") to improve his physical health.  *Id.*

Plaintiff often received low scores from his supervisors on the Department's annual evaluations for "personal appearance and equipment maintenance."  Plaintiff's Fact Statement ¶ 139.  On various occasions, Plaintiff was taunted by co-workers, who called him "Crisco" and "Omar the Tent Maker," referring to the size of Plaintiff's uniform.  Plaintiff's Fact Statement ¶ 141.  Camilleri was aware of the name-calling, but did nothing to stop it, *id.*; Weiss Affidavit Exh. I ("Arnet Deposition") at 50, and occasionally participated in such behavior, for example, on one occasion advising employees who were attending a Department picnic in the summer of 1998 or 1999 that they should stand next to Plaintiff because Plaintiff will provide shade from the sun.  Plaintiff's Fact Statement ¶ 142.  Camilleri also stated Plaintiff was "lackadaisical."  *Id.* (citing Weiss Affidavit, Exh. G ("Jasinski Deposition") at 185).

On May 19, 2001, Department Captain Charles R. Jasinski ("Jasinski"), in the presence of other police officers, compared Plaintiff to a disabled person with no arms who could not adequately perform work.  Caruso Affidavit ¶ 11.  Jasinski also told Plaintiff that "the Department" wanted Plaintiff working "as little as possible," and, referring to two officers who had been disciplined by the Department and were no longer employed by the Department, stated "two down *and* . . ." and "smiled" at Plaintiff.  *Id.* ¶¶ 11-12.  When Plaintiff complained to Camilleri about Captain Jasinski's derogatory comments,  Camilleri replied, "Charlie [Jasinski] will be Charlie."  *Id.* ¶ 13.  Captain Gary Snyder ("Snyder"), who retired from the Department on September 4, 2001 and who occasionally drew cartoon-like caricatures of the Department's officers, drew at least one such caricature of Plaintiff emphasizing Plaintiff's morbidly obese

6

condition.  Plaintiff's Fact Statement ¶ 130.   Plaintiff represents that one such
caricature of him was posted in the police officers' lunchroom and another in Chief
Camilleri's office through 2002, while Plaintiff was on a forced, unpaid leave of absence
from the Department.  Caruso  Deposition at 45-51.  Former Lieutenant Ronald Sardina
("Sardina") testified in his deposition that Plaintiff was perceived to be "extremely
overweight and lazy." Plaintiff's Fact Statement ¶ 134 (citing Weiss Affidavit, Exh. H
("Sardina Deposition")) at 14; Weiss Affidavit, Exh. 30 ("Deposition Exh. 97") at 479).

During his employment with the Department, Plaintiff was suspended four times
by the Department –  December 21, 1995 (one day); August 25, 1997 (five days);
January 25, 1999 (25 days); and October 21, 1999 (22 days), Defendants' Fact
Statement ¶ 124 (citing Doren Affidavit, Exh. 25, ("Personnel Documents Regarding
Plaintiff"), for allegedly failing to follow established procedures applicable to submitting
reports and attending briefings, falsifying official Department business records, not
timely processing a prisoner whom Plaintiff had arrested, and improper conduct with
female citizens in the Village, respectively.  *Id.*  Defendants posted a vacant lieutenant
position, to which he sought to be promoted, within one month after the end of Plaintiff's
disciplinary probation period in or around August of 2001.  Plaintiff's Fact Statement ¶
126.  However, Plaintiff was denied promotion to a lieutenant position on various
occasions upon several grounds identified by Defendants, including (i) that Plaintiff was
on probation for disciplinary suspension by a hearing officer following a New York Civil
Service Law  Section 75 proceeding conducted in May of 1999; [4] and (ii) Plaintiff agreed

---

[4]  Section 75 of the New York Civil Service Law permits removal and other disciplinary action for
employee incompetency or misconduct subsequent to a hearing on these issues.  N.Y. Civil Service Law §

to a 20-day disciplinary suspension in September of 2001 and a two-year probationary period on October 21, 1999 based on complaints of improper personal contact which were filed by four women.  *Id.* at 26.  Department Officer Drapo was promoted while on disciplinary probation, according to Plaintiff. Plaintiff's Fact Statement ¶ 130.

Since 1999, the Department has instituted emergency rapid deployment training ("RDT") for its road patrol officers, including Plaintiff.  Fact Statements ¶¶ 3; Defendants' Memorandum at 1.  RDT seeks to provide police officers with skills necessary to handle a violent situation unfolding inside of a building.  Defendants' Fact Statement ¶ 3.  On December 5, 2001, Plaintiff participated in the Department's RDT session.  The training consisted of four-person police officer teams that "rapidly" approached a supposed dangerous perpetrator inside of a building while maintaining a 360 degree formation "to ensure the integrity of the group and the safety of fellow police officers."  Plaintiff's Fact Statement ¶¶ 3, 6-7.  Each member of the group is instructed to move rapidly in unison with the group while maintaining a diamond-shape formation. Plaintiff's Fact Statement ¶¶ 5-7.  At the time Plaintiff participated in the RDT session, Plaintiff weighed 398 pounds.  Defendants' Fact Statement ¶ 82.

Officer Qualey ("Qualey") and Officer Rule ("Rule") of the Department had attended specialized RDT training provided by another law enforcement agency to enable them to instruct other officers in the Department in proper rapid deployment procedure.  Defendants' Fact Statement ¶ 8.  Officer Qualey attended a three-day training program presented by the Erie County Department of Central Police Services in

---

75 (McKinney 2007).

2001, and Officer Rule attended a one-day training program at the Town of Tonawanda Police Department, another local police department.  Defendants' Fact Statement ¶¶ 9, 10.  Officer Qualey, formerly a deputy sheriff in another county, had worked as an aerobics and weight-lifting instructor prior to obtaining employment with the Department.  *Id.* ¶ 9.  Before joining the Department's police force, Officer Rule had worked as a patrol officer for another area village.  *Id.* ¶ 10.  The RDT session consisted of two parts, a classroom instruction component including a written examination ("the exam"), and a practical component.  Plaintiff's Fact Statement ¶¶ 11, 12.  There was no grade assigned to the practical portion of the training, and officers were required to score 70% or better on the exam before participating in the practical portion.  Camilleri Deposition at 75-78, 83.  Plaintiff successfully completed two-thirds of the practical portion of the RDT.  *Id.* at 107-08, 111.  Each component of the practical training was equally weighted.  *Id.* at 111-12.

The purpose of RDT session was to instruct officers in the Department on "the technical aspects of rapid deployment," not to test the officers' specific physical conditioning.  Camilleri Deposition at 77.  Several officers were excused from participating in one or more of the RDT sessions.  Officer Kirsch, on medical leave in the fall of 2001, was not required to participate in the fall RDT sessions. [5]  Defendants' Fact Statement ¶ 120.  Camilleri himself did not participate in the September 2003 RDT session because of a scheduling conflict.  *Id.*  Assistant Chief LaCorte and Detective

---

[5] Kirsch participated in the September 2003 RDT session.  *Id.* (citing Doren Affidavit, Exh. D. ("Camilleri Deposition") at 527-32; Doren Affidavit, Exh. L ("Defendants' Answers to Interrogatories"), Answer No. 2(a)).

Scott were not required to participate in the Department's last RDT session, conducted in December of 2004, as LaCorte was recovering from surgery, and Scott was retiring. Defendants' Fact Statement ¶¶ 122-23.

Following the November 20, 2001 RDT session, the Department determined subsequent RDT sessions should be videotaped "as a training tool" to show participants their mistakes during the session. Defendants' Fact Statement ¶ 18. Because there was more than one team performing an RDT exercise at a time, the Department did not videotape every RDT session. *Id.* ¶ 19 (citing Doren Aff., Exh. B ("Qualey Deposition") at 127; Doren Aff., Exh. D ("Camilleri Deposition") at 22-24, 27-28; Doren Aff., Exh. 3 ("Rapid Deployment Videotape").[6] As such, only the first and third practical exercises of Plaintiff's RDT session on December 5, 2001 were videotaped. Defendants' Fact Statement ¶¶ 19, 20. *Id.* (citing Camilleri Deposition at 12, 363-64; Doren Aff. ¶ 8.

During the December 5, 2001 RDT, Plaintiff was kept in the rear guard position of the RDT group, requiring him to advance backwards throughout most of the third exercise. Plaintiff's Fact Statement ¶ 20. Plaintiff became separated from his team several times during the training exercise, prompting team-members to shout at Plaintiff "come on Mike, let's move." *Id.* Plaintiff asserts that the lead member of Plaintiff's team walked away from the 360 degree formation after 16 minutes and 12 seconds into the RDT exercise. *Id.* Plaintiff also maintains that Plaintiff's RDT team moved rapidly five times more often during the practical exercise than another team being led by Camilleri. *Id.*

---

[6] It was not necessary to the court's consideration of the instant motion to review the Rapid Deployment Videotape.

Camilleri, who personally observed Plaintiff's performance on December 5, 2001 stated that, in light of Plaintiff's performance during the practical portions of the RDT exercise session, he had "no choice" but to re-evaluate whether Plaintiff's physical condition enabled Plaintiff to perform his duties.  Defendants' Fact Statement ¶¶ 22-23. Camilleri added he had no reason to evaluate other officers' physical capabilities in light of their RDT practical exercise performances because he made "no similar observations" of other officers indicating deficiencies like those Camilleri attributed to Plaintiff.  *Id.* at 23 (referencing Camilleri Deposition at 197-98).  Based on Plaintiff's December 5, 2001 RDT performance, Camilleri concluded that Plaintiff was in a "deconditioned" physical state evidenced by Plaintiff's labored breathing and inability to concentrate or maintain a sustained level of required physical activity during the RDT practical session.  Defendants' Fact Statement ¶ 25 (referencing Camilleri Deposition at 16, 25).

Approximately one week following the December 5, 2001 RDT session, Officer Lewandowski ("Lewandowski") told Qualey he was concerned about Plaintiff's RDT practical performance.  Defendants' Fact Statement ¶ 27 (referencing Qualey Deposition at 158-59).  Officer Stapleton ("Stapleton") told Qualey that Plaintiff would be a liability in a real-life rapid deployment situation.  *Id.* ¶ 28 (referencing Qualey Deposition at 158-59, 165-68).  In a written report to Camilleri, dated December 13, 2001, Qualey observed that Plaintiff became too fatigued to complete the December 5, 2001 practical RDT exercise, broke Plaintiff's group's diamond formation, and fell "well behind the other three" group members.  *Id.* ¶ 33.  Qualey noted "members of the [Plaintiff's] group had to continually instruct Officer Caruso to try to catch up and direct

him where to go," causing the other team members  to lose their concentration.  *Id.*
(referencing Doren Aff., Exh. 4 ("12/13/01 Memorandum")).  Qualey opined that
Plaintiff's RDT deficient physical performance would place the safety of the participating
officers, the individuals the officers may be attempting to assist, as well as that of
Plaintiff himself, at risk in a real-life rapid deployment situation.  *Id.*  In a letter to
Camilleri, dated December 20, 2001, Rule described how Plaintiff's team members
encouraged Plaintiff to catch up to them and to maintain the requisite group formation
during the RDT practical exercise  which, according to Rule, had "completely fallen
apart" because of Plaintiff's physical unfitness and concluded that Plaintiff's poor
physical performance "could jeopardize others if the situation of an active shooter
should arise . . .."  *Id.* ¶ 35 (referencing Doren Aff., Exh. 5  ("12/20/01
correspondence")).

  In response to these communications, Camilleri spoke with Plaintiff's RDT team
members about Plaintiff's performance during the December 5, 2001 RDT session.
Defendants' Fact Statement ¶ 36 (referencing Camilleri Deposition at 244-46, 421-23;
Doren Aff., Exh. 6 ("Camilleri Notes dated 12/17/01, 12/19/01 and 12/23/01")).  The
other team members of Plaintiff's RDT team – Officers Stapleton and Lewandowski –
informed  Camilleri that they would rather enter a building during  a real rapid
deployment situation without Plaintiff because Plaintiff's performance deficiency would
make the situation more dangerous.  *Id.*  Based on Camilleri's personal observations of
Plaintiff's December 5, 2001 RDT practical performance, Camilleri's review of the RDT
session videotape, and communications with Qualey, Rule, Stapleton and
Lewandowski, Camilleri met with Plaintiff and Plaintiff's union representative and

offered Plaintiff the option of being charged by the Department with incompetency for failing to perform his job duties under Section 75 of the New York Civil Service Law, or accepting an unpaid leave of absence during which time Plaintiff could attempt to improve his physical conditioning in order to successfully complete another RDT practice session.  *Id.* ¶¶ 41-43 (referencing Camilleri Deposition at 255-58; Doren Aff., Exh. 7 ("Settlement Agreement" or "the Settlement Agreement"); Doren Aff., Exh. 8 ("Camilleri outline for 12/26/01 meeting")).  Plaintiff elected the proposed leave of absence, which would terminate when Plaintiff demonstrated "physical ability to protect himself, and possible victims . . .," *i.e.*, perform sufficiently during an RDT practical exercise, and result in Plaintiff's reinstatement.  *Id.*; *Id.* ¶ 46 (referencing the Settlement Agreement).

Plaintiff and Defendants, on January 28, 2002, signed the Settlement Agreement which provided that Plaintiff was placed on an involuntary, unpaid leave of absence "in lieu of" the Department initiating proceedings to remove Plaintiff from the police force, pursuant to state law.   Settlement Agreement ¶ 1.  Under the Settlement Agreement, Plaintiff waived his rights under the collective bargaining agreement between his police union and the Village regarding leave from active employment, and was permitted to use accrued, unused sick time to cover his leave of absence.  Settlement Agreement ¶¶ 1-2.  The Settlement Agreement also provided that Plaintiff would be given three opportunities to successfully complete a RDT practical exercise session "similar in nature to the 'rapid deployment training' exercise that was conducted on December 5, 2001," following which, if successfully completed by Plaintiff, Plaintiff would be reinstated.  Settlement Agreement at 4, 7, 10.  According to the Settlement Agreement,

a three-member panel, selected by both parties, and which included then-Department Captain Larry Hoffman ("Hoffman"), Village Training Officer Qualey and Camilleri, would determine if Plaintiff had successfully completed the session, and provided that "[t]he determination of the panel shall not be subject to review pursuant to any statutory or collective bargaining procedure."  Settlement Agreement ¶ 5.

Since commencing his leave of absence, Plaintiff assertedly had lost 80 pounds and, on April 16, 2002, at Plaintiff's request, Plaintiff participated in a RDT practical exercise, similar to the one conducted on December 5, 2001, as provided in the Settlement Agreement.  Defendants' Fact Statement ¶ 58 (citing Caruso Deposition at 293-94, 309).  Plaintiff's RDT team members included Officer Michael Paternostro ("Officer Paternostro" or "Paternostro"), Officer David Lewandowski ("Officer Lewandowski" or "Lewandowski"), and Officer Timothy Phillips ("Officer Phillips" or "Phillips").  *Id.* ¶ 61.  As provided in the Settlement Agreement, the three-member panel that observed the RDT session included Hoffman, Qualey and Camilleri whom, following the RDT session, determined that Plaintiff did not successfully complete the session, although Camilleri observed that Plaintiff's performance had improved since the December 5, 2001 RDT practical exercise session.  *Id.* ¶¶ 53, 57, 67-68; Camilleri Deposition at 456-59.  On May 1, 2002, Camilleri informed Plaintiff and Plaintiff's union representative that Plaintiff had not successfully completed the April 16, 2002 exercise. Defendants' Fact Statement ¶ 68.

After unsuccessfully grieving and arbitrating the panel's first retest determination,[7] arguing the April 16, 2002 RDT practical exercise was not "similar in nature" to the December 5, 2001 RDT exercise, that he was not advised why he failed and "that the panel exceeded its authority," Plaintiff, in November 2002, requested a second RDT retest.[8]  Defendants' Fact Statement ¶¶ 71-72 (referencing Doren Aff., Exh. 12 ("6/3/02 grievance"); Doren Aff., Exh. 13 ("6/02 grievance-related documents")); Defendants' Fact Statement ¶ 72 (citing Doren Aff., Exh. 14 ("12/20/02 Opinion and Award")); Defendants' Fact Statement ¶ 74 (referencing Caruso Deposition at 300, 307).  At the time of Plaintiff's request, Plaintiff had exhausted all of his available sick time.  *Id.* ¶¶ 73-74.  The panel and team members present for the retest, scheduled for March 12, 2003,  were the same as those who reviewed Plaintiff's first RDT practical exercise retest in April 2002.  *Id.* ¶ 75.  The panel determined that Plaintiff successfully completed the second RDT session, and returned Plaintiff to full-time work as a police officer.  *Id.* ¶ 76.  Plaintiff weighed approximately 300 pounds when reinstated on March 17, 2003, about the same weight as when Plaintiff failed the first RDT in April 2002, then weighing 308 pounds, Complaint ¶ 29, which, according to the BMI table, indicates morbid obesity.   Facts, *supra,* at 3 n.2.

Plaintiff concedes he has no knowledge of what physiological or other condition,

---

[7] Plaintiff waived his rights under the union collective bargaining agreement regarding his unpaid leave from active employment, however, the Settlement Agreement specifically stated that such waiver did not constitute a waiver of any other rights Plaintiff had under the collective bargaining agreement "regarding matters other than this leave from active employment."  The Settlement Agreement ¶ 1.

[8] The Settlement Agreement provided that Plaintiff could have requested a second retest within 30 days of the panel's determination that Plaintiff unsuccessfully completed the first retest.  Defendants' Fact Statement ¶ 70.

if any, causes his apparent obesity, nor was he aware of such diagnosis by his general physician, Dr. Penepent.  Defendants' Fact Statement ¶¶ 83, 84 (referencing Caruso Deposition at 13-14).  Dr. Penepent averred that he never diagnosed Plaintiff as having a physiological condition that causes Plaintiff's morbid obesity, Doren Affidavit, Exh. G ("Dr. Penepent Deposition") at 88, but Dr. Penepent had described Plaintiff as morbidly obese in his medical treatment entries in Plaintiff's record.  Plaintiff's Memorandum ¶ 83 (citing Weiss Affidavit, Exh. 18 ("Dr. Penepent entries for 12/29/94, 8/1/96, 6/26/97, 11/19/99, letter dated 8/1/96 to Camilleri, and letter dated 10/25/2002 to Arbitrator Rinaldo")).  Plaintiff also states that testing ordered by Dr. Penepent revealed Plaintiff had low testosterone levels which, according to Plaintiff's interpretation, may cause Plaintiff's morbid obesity.  Caruso Affidavit ¶ 5.  Chief Camilleri testified that the Department did not instruct Plaintiff to undergo a medical exam to determine whether he could perform his job duties in 2001 following the December 2001 RDT exercise, because the Department "had no reason to think there was anything medically wrong with [Plaintiff]."  Camilleri Deposition at 417.

In June 2002, while Plaintiff was on leave, the Department advised Plaintiff in writing that Plaintiff violated Department regulations by contacting the Village Clerk to inquire about time used during his leave of absence rather than posing his questions to officers in the Department's chain-of-command, and informed Plaintiff that the Department would take up this matter with Plaintiff upon Plaintiff's return to work.  Doren Affidavit, Exh. 18 ("6/27/02 correspondence").

On September 25, 2002, Plaintiff filed a charge of discrimination based on disability with the New York State Division of Human Rights ("DHR").  Defendants' Fact

Statement ¶ 101 (referencing Doren Affidavit, Exh. 17 ("DHR Discrimination Charge")).

When Plaintiff returned to work in May of 2003, he received a written warning regarding

his contact with the Village Clerk regarding benefits.  Doren Affidavit, Exh. 19

(Camilleri's 5/7/03 warning).  Further, upon Plaintiff's reinstatement, Plaintiff was also

questioned by the Department regarding allegations that he had engaged in outside

employment with a local cab company without first obtaining permission from the

Department as required by Department regulations.  Defendants' Fact Statement ¶ 110.

The Department did not discipline Plaintiff in relation to this allegation.  Defendants'

Fact Statement ¶ 111.

In December 2002, Christine Michalski, a Child Protective Services ("CPS")

Investigator ("the CPS Investigator"), allegedly contacted Village Assistant Chief of

Police LaCorte ("LaCorte") and informed LaCorte that Plaintiff and Plaintiff's wife were

being investigated by CPS.[9]  Fact Statements ¶¶ 112; Doren Affidavit, Exh. H ("LaCorte

Deposition") at 67-68; Doren Affidavit, Exh. 25 ("Rules and Regulations Regarding

Outside Investigations").  The Department requires that officers inform the

Department's Chief if they are under investigation by an outside agency.  Rules and

Regulations Regarding Outside Investigations.  Plaintiff was questioned about the

alleged investigation at a meeting in April 2003, of which he denied knowledge, and no

disciplinary action was taken by the Department against Plaintiff regarding this matter.

Defendants' Fact Statement ¶ 114 (citing Caruso Deposition at 361); Doren Affidavit,

Exh. 23 ("6/3/03 correspondence").

---

[9] CPS is a local governmental agency.

On June 3, 2003, Plaintiff filed a retaliation complaint with the DHR against Defendants.  Defendants' Fact Statement ¶ 101 (citing Exh. 27 ("DHR Retaliation Charge")).  Specifically, Plaintiff charged that Defendants retaliated against him by (i) questioning Plaintiff about and citing him for communicating with the Village Clerk about his vacation benefits in violation of proper chain-of-command procedures; (ii) questioning Plaintiff about an alleged investigation involving him conducted by CPS; (iii) questioning Plaintiff about his possible unapproved outside employment as a cab driver; and (iv) withholding workers compensation benefits in violation of New York General Municipal Law Section 207(c) ("Section 207(c)"). [10]   Fact Statements ¶¶ 101-102.

## DISCUSSION

### 1.    Summary Judgment

Summary judgment of a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) and (b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986); *Rattner v. Netburn*, 930 F.2d 204, 209 (2d Cir. 1991).  The court is required to construe the evidence in the light most favorable to the non-moving party.  *Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir. 1999) (citing *Anderson*, 477

---

[10] Section 207(c) provides that a police officer who is injured in the line of duty is entitled to receive his full salary while recuperating from such injuries.  N.Y. Gen. Mun. Law § 207(c) (McKinney's 2007).  Section 207(c) also requires the municipality to pay for any medical treatment or hospital costs associated with the injury.  *Id.*

U.S. at 255).  The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment. *Celotex*, 477 U.S. at 322; *see Anderson*, *supra*, at 247-48 ("summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").  In considering a summary judgment motion, the function of a district court is not to resolve disputed issues of fact, but to determine whether there are genuine issues to be tried.  *Rattner, supra,* at 209.

In assessing the record, including any affidavits, exhibits, and other submissions, the court is required to resolve all ambiguities and to draw all factual inferences in favor of the nonmoving party.  *Anderson, supra,* at 255; *Rattner, supra,* at 209.  If the moving party meets its burden of demonstrating the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e). The nonmoving party may not rest upon unsubstantiated allegations, conclusory assertions or mere denials, but must set forth and establish specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e).  A metaphysical or other speculative doubt concerning a material fact does not establish a genuine issue requiring trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 584 (1986).

2.      **Disability-based Employment Discrimination**

Plaintiff claims that Defendants discriminated against him with regard to his employment based on his obesity, in violation of the ADA and  NYHRL by regarding Plaintiff as morbidly obese, Complaint ¶¶ 15, 30 (ADA); ¶¶ 15, 58 (NYHRL), failing to accommodate Plaintiff's disability, Complaint ¶¶ 19-20  (ADA); ¶ 58 (NYHRL), creating a hostile work environment by condoning harassment of Plaintiff based on such obesity, Complaint ¶¶ 53-54 (ADA); ¶¶ 65-66 (NYHRL), retaliating against Plaintiff for requesting an accommodation of his alleged disability, *i.e.,* the request for a light-duty assignment to enable Plaintiff to lose weight and retake the RDT practical exercise test, Complaint ¶ 49 (ADA); ¶ 62 (NYHRL), and subjecting Plaintiff to terms and conditions of employment which were different from other officers.  Complaint ¶ 30 (ADA); ¶ 58 (NYHRL).  Specifically, Plaintiff contends that his disability is obesity, however, Plaintiff also maintains that his physical impairment is morbid obesity.  Plaintiff's Memorandum at 10.

Defendants move for summary judgment on all of Plaintiff's claims on the grounds that Plaintiff has failed to, and cannot, establish a *prima facie* case of employment discrimination based on a disability because Plaintiff does not suffer with a disability within the meaning of the ADA, Defendants' Memorandum at 30-33.  If the court dismisses Plaintiff's federal claims, Defendants further contend that the court should decline to exercise supplemental jurisdiction over Plaintiff's state claim, Defendants' Memorandum at 49-50, citing  *Marcus v. AT &T Corp.,* 138 F.3d 46, 57 (2d Cir. 1998) ("[i]n general, where the federal  claims are dismissed before trial, the state law claims should be dismissed as well"), and *Giordano v. City of N.Y.,* 274 F.3d 740,

754 (2d Cir. 2001) (once federal claims are dismissed, whether plaintiff is disabled

under New York state law "is a question best left to the courts of the State of New

York")).  In particular, Defendants contend (i) that Plaintiff is not disabled under the

ADA, in that Plaintiff's obesity did not substantially limit a major life activity as required

by 29 C.F.R. § 1630.2(k), and that Defendants never regarded Plaintiff as disabled

"within the meaning of the ADA," as  prohibited by 42 U.S.C. § 12102(2)(C).

Defendants' Memorandum at 30-33.  Defendants also contend that Plaintiff was not

subjected to any adverse employment action based on his alleged disability, *id.* at 36,

and that Plaintiff was not denied a reasonable accommodation. *Id.* at 36-38.

Defendants further assert that Plaintiff has failed to allege an actionable hostile work

environment claim under the ADA, Defendants' Memorandum at 38-41, and has also

failed to successfully state a retaliation claim under the ADA.  *Id.* at 41-48.  Finally,

Defendants assert that any claims of discrimination concerning events which occurred

300 days or more before September 25, 2002, the date on which Plaintiff filed his DHR

charge, are time-barred.  *Id.* at 48-49.

     In opposition to summary judgment, Plaintiff argues (i) evidence in the record

demonstrates he is disabled, and that he was regarded by Defendants as disabled

under the ADA and the NYHRL, in that he was morbidly obese and perceived by

Defendants as such, Plaintiff's Memorandum at 2, 6, 8 -17; (ii) Plaintiff had a record of

impairment under 29 C.F.R. § 1630.2(k), [11] *id.* at 12-13; (iii) Defendants failed to

---

[11] To have a record of impairment under the ADA, an individual must have a history of a mental or physical impairment or be perceived as having such an impairment which substantially limits a major life activity.  29 C.F.R. § 1630.2(k).

reasonably accommodate Plaintiff's disability, including his requests for reassignment to a light-duty, *i.e.,* less physically strenuous position, to accommodate a period within which Plaintiff could prepare to retake and pass the RDT test, in violation of the ADA and the NYHRL, *id.* at 30; (iv) Defendants more severely disciplined Plaintiff for failing to complete successfully a training exercise than they did other employees, *id.* at 26-27; see also (Doc. No. 77) (sealed document); (v) Defendants created a hostile work environment by condoning name-calling and disparaging caricatures of Plaintiff relating to his obesity, *id.* at 28-30; (vi) Defendants retaliated against Plaintiff by disciplining him for consulting the Village Clerk about Plaintiff's benefits, *id.* at 30-31, interrogating Plaintiff about alleged outside employment, *id.* at 32, questioning Plaintiff about an alleged CPS investigation, *id.* at 32-33, and delaying payment of Plaintiff's state-mandated workers compensation benefits. *Id.* at 33.

In reply, Defendants reassert that Plaintiff has not established a *prima facie* case of employment discrimination based on a protected disability, work-place harassment, or retaliation under the ADA or the NYHRL.[12]  Defendants' Reply Memorandum at 15-22.  Specifically, Defendants submit that the alleged tests by Dr. Penepent which, according to Plaintiff, indicate Plaintiff suffers from "a medical condition of low testosterone which may contribute to [his] morbid obesity" is not substantiated by any admissible evidence in the record other than Plaintiff's deposition testimony, Defendants' Reply Memorandum at 2, and, therefore, no competent evidence links

---

[12]  Defendants argue that if the court exercises jurisdiction over Plaintiff's state law claims, such claims should be dismissed as Plaintiff has not shown he suffered adverse employment action based on his alleged disability.  Defendants' Reply Memorandum at 21-22.  Thus, the court treats Defendants' motion as seeking summary judgment against Plaintiff's federal and state law claims.

Plaintiff's condition to a medically recognized physiological impairment sufficient to establish Plaintiff suffers from a qualified disability under the ADA.  *Id.* at 2-4. Defendants also maintain that morbid obesity is not a disability entitled to protection under the ADA, and given that there is no physiological factor contributing to Plaintiff's excessive weight, Defendants argue Plaintiff has not shown he was disabled within the meaning of the ADA.  *Id.* at 16-17.

Even assuming that Plaintiff suffers from a qualified disability, Defendants also contend that no admissible evidence demonstrates Plaintiff's alleged impairment, either Plaintiff's obesity or its cause, substantially limited a major life activity.  Defendants' Reply Memorandum at 17.  Therefore, Defendants assert that Plaintiff has failed to establish that he is disabled under the ADA.  *Id.* at 16-17.  Additionally, Defendants argue no evidence demonstrates Defendants perceived Plaintiff as disabled within the meaning of the ADA, Defendants' Memorandum at 18, that Plaintiff, who has no record of disability and continues to work as a Village police officer despite his weight, Defendants' Reply Memorandum at 18-21; Defendants' Fact Statement ¶ 2 (referencing Doren Affidavit ¶ 4; Camilleri Deposition at 132-33; Complaint ¶ 12, and that Plaintiff has not shown, as required, that Plaintiff could perform the essential functions of his job in December 2001 with or without a reasonable accommodation.  Defendants' Memorandum at 33-36.  Finally, Defendants argue that, should the court  exercise jurisdiction over Plaintiff's state claims, summary judgment should be granted as to all of Plaintiff's claims because Plaintiff can not demonstrate he suffered adverse action by Defendants because of Plaintiff's disability.  Defendants' Reply Memorandum at 22.

**A.     Plaintiff's ADA Claims**

     **1.     *Prima Facie* Case**

To establish a *prima facie* case of discrimination under the ADA, a plaintiff must establish by a preponderance of the evidence that (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of the job with or without a reasonable accommodation; and (4) he suffered an adverse employment action based on his disability.  *Reeves v. Johnson Controls World Servs., Inc.*, 140 F.3d 144, 149-50 (2d Cir. 1998) (citing *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 869-70 (2d Cir. 1998)).

"The ADA prohibits discrimination by covered entities, including private employers, against qualified individuals with a disability. Specifically, it provides that no covered employer 'shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to . . . [the] discharge of employees . . ..'" *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 477-48 (1999) (quoting 42 U.S.C. § 12112(a)).  To be subject to the ADA, an employer must be "engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year."  29 C.F.R. § 1630.2(e)(1).  In the instant case, that Defendant is an employer subject to the ADA is not disputed.

          **a.     Disability under the ADA**

The ADA protects Plaintiff only if Plaintiff is a "qualified individual with a disability," 42 U.S.C. § 12112(a), which is defined as

          an individual with a <u>disability</u> who, with or without reasonable

accommodation, can perform the essential functions of the employment
position that such individual holds . . . .

42 U.S.C. § 12111(8) (underlining added).

Further, as relevant, the ADA defines a "disability" as

(A) a physical or mental impairment that <u>substantially limits one or more of the
major life activities of [an] individual</u>;
(B) a record of such an impairment; or
(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2) (underlining added).

Under Equal Employment Opportunity Commission ("EEOC") regulations

implementing the ADA, a physical or mental impairment is defined as "[a]ny

physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting

one or more of the following body systems: neurological, musculoskeletal, special

sense organs, respiratory (including speech organs), cardiovascular, reproductive,

digestive, genito-urinary, hemic and lymphatic, skin and endocrine."  29 C.F.R. §

1630.2(h)(i).   Generally, unless related to a physiological disorder, obesity has not

been held to constitute an impairment under the ADA.  *Francis v. City of Meriden*, 129

F.3d 281, 286 (2d Cir. 1997) ("obesity, except in special cases where the obesity

relates to a physiological disorder, is not a 'physical impairment' within the meaning of

the [ADA] statutes").  In *Francis*, the Second Circuit stated that "a cause of action may

lie against an employer who discriminates against an employee on the basis of the

perception that the employee is morbidly obese . . . or suffers from a weight condition

that is the symptom of a physiological disorder," *Francis, supra*, at 286.  However, the

court also stated that "no cause of action lies against an employer who simply

disciplines an employee for not meeting certain weight standards." *Id*.  Therefore,

morbid obesity without evidence of a physiological cause does not constitute an "impairment" under the ADA, and as such, is not a disability upon which liability under the ADA may be based.  *EEOC v. Watkins Motor Lines, Inc.*, 463 F.3d 436, 441 (6th Cir. 2007).

Although Plaintiff asserts that Dr. Penepent determined Plaintiff's low testosterone levels may contribute to his morbid obesity based on tests conducted on Plaintiff as requested by Dr. Penepent, following Dr. Penepent's and Plaintiff's depositions, Caruso Affidavit ¶ 5, Plaintiff fails to proffer any expert opinion, including an opinion prepared by his treating physician, Dr. Penepent, to establish the existence of a physiological relationship between Plaintiff's morbid obesity and Plaintiff's supposed low testosterone levels, and how such a medically recognized relationship qualifies Plaintiff as one subject to being perceived as disabled under the ADA.[13]  The court's research reveals no case allowing an ADA disability claim on the basis of a mere possibility of a physiological connection, and Plaintiff points to none.  See *Matsushita Elec. Indus. Co.,* 475 U.S. at 584 (mere speculation as to factual basis for claim insufficient to avoid summary judgment).  Therefore, as Plaintiff has failed to provide admissible evidence that (i) Plaintiff's morbid obesity is caused in any way by his allegedly low testosterone levels, (ii) nothing in the record supports Plaintiff's hearsay assertion that he in fact suffers from low testosterone levels, (iii) Plaintiff is unable to control his weight by diet and exercise, or (iv) that Dr. Penepent ever found a medically recognized physiological basis to be the cause of Plaintiff's morbid obesity,

---

[13] The record provides no information as to a medically accepted definition of low testosterone or how such supposedly low testosterone level may cause obesity.

Plaintiff is unable to establish a disability under the ADA as a matter of law.  Therefore,

Defendants' motion directed to Plaintiff's cause of action under the ADA should be

GRANTED on this ground.


   **b.    Impairment Substantially Limiting a Major Life Activity**

   Under the ADA, major life activities are defined as "functions such as caring for

oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing,

learning and working."  29 C.F.R. § 1630.2(I) ("§ 1630.2(j)").  The EEOC has also stated

that '[t]he determination of whether an individual is substantially limited in a major life

activity must be made on a case by case basis, without regard to mitigating measures

such as medicines or assistive or prosthetic devices.'"  *Sutton v. United Air Lines, Inc.*,

527 U.S. 471, 480 (1999) (quoting 29 C.F.R. pt. 1630, App. § 1630.2(j) (1998)

(describing § 1630.2(j)).  The Supreme Court, however, has not determined the extent

of deference that courts must give the EEOC guidelines.  *See Sutton*, *supra*, 527 U.S.

at 480 (refraining from deciding "what deference is due" the interpretive guidelines

issued by agencies regarding the ADA).  Accordingly, courts afford the regulations and

interpretive guidelines some deference.  *See Giordano v. City of New York*, 274 F.3d

740, 747 (2d Cir. 2001) ("Because the Equal Employment Opportunity Commission

('EEOC') is the agency that bears responsibility for implementing specific provisions of

the ADA, we generally defer to the EEOC regulations in construing ADA's terms.").

   According to the Supreme Court, a person whose physical impairment "is

corrected by medication or other measures does not have an impairment that presently

'substantially limits' a major life activity." *Sutton*, 527 U.S. at 482-83. Thus, "to be substantially limited in the major life activity of working . . . one must be precluded from more than one type of job, a specialized job, or a particular job of choice." *Sutton,* 527 U.S. at 492. Relevantly, in *Sutton*, *supra*, the Court also rejected EEOC guidelines that called for persons alleging disability-based discrimination under the ADA "to be evaluated in their hypothetical uncorrected state" to be "an impermissible interpretation of the ADA." *Sutton*, 527 U.S. at 482.

Even assuming that Plaintiff could successfully establish he suffers from obesity, Plaintiff has failed to establish his obesity results from an impairment recognized under the ADA, *i.e.*, that his obesity is related to or caused by physiological factors, Discussion, *supra,* at 25-26, or, of equal relevance in the instant case, that such obesity substantially limited one or more of Plaintiff's major life activities, particularly the ability to work. 42 U.S.C. § 12102(2). In the instant case, the subject major life activity alleged by Plaintiff is working. Plaintiff's Memorandum at 16. "Work is specifically included in the [EEOC] regulations as an activity fitting within the definition of 'major life activity' for ADA purposes." *Dietrich v. E.I. Du Pont de Nemours & Co.*, 2004 WL 2202656 at * 8 (W.D.N.Y. 2004) (citing 29 C.F.R. § 1630.2(i)). Whether an impairment "substantially limits" an individual's ability to work depends on the range of jobs for which the individual is disqualified by his impairment. *Dietrich*, 2004 WL at * 8 ("In the context of an ADA claim alleging an inability to work, '[a]n impairment that disqualifies a person from only a narrow range of jobs is not considered a substantially limiting one.'") (quoting *Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 723 (2d Cir. 1994)). *See also Sutton,* 527 U.S. at 491-92 (expressing reservation whether the ability to work, *per se,*

constitutes a major life activity under the ADA).  Further, the EEOC regulations defining

the inability to work as a major life activity provide, in relevant part

> With respect to the major life activity of working - -
>
> (i) The term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. <u>The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.</u>

29 C.F.R. § 1630.2(j)(3)(i) (underlining added).

Here, the record is devoid of admissible evidence from which a reasonable trier

of fact could find that Plaintiff's ability to work was substantially limited within the

meaning of the ADA.  Thus, Defendants' motion directed to Plaintiff's cause of action

under the ADA should be GRANTED on this ground.

### 3.    Plaintiff "Regarded As" Having An Impairment

Plaintiff also argues that he is disabled under the ADA because the Defendants

regarded Plaintiff as having a physical impairment, that being morbid obesity, which

Defendants allegedly perceived as substantially limiting one or more of Plaintiff's major

life activities.  Plaintiff's Memorandum at 5-7 (citing 42 U.S.C. § 12102(2)(c)).  Plaintiff's

failure to demonstrate that he suffers from an impairment which substantially limits a

major life activity within the protection of the ADA does not preclude Plaintiff from

obtaining relief under the ADA upon demonstrating that he was, notwithstanding,

"regarded as having such an impairment."  42 U.S.C. § 12102(2)(C); *see Francis v.*

*Meriden*, 129 F.3d 281, 284 (2d Cir. 1997) (individual need not actually have a physical

impairment within the meaning of the ADA to state a claim under the "regarded as"

prong of the ADA).  The relevant EEOC regulations define "regarded as having an

impairment" as

> (1) Has a physical or mental impairment that does not substantially limit a
> major life activity, but is treated . . . as constituting such limitation;
> (2) Has a physical or mental impairment that substantially limits major life
> activities only as a result of the attitudes of others toward such
> impairment; or
> (3) Has none of the impairments defined [by the EEOC regulations] but is
> treated . . . as having a substantially limiting impairment.

29 C.F.R. § 1630.2(l).

However, it is not enough for a plaintiff alleging employment discrimination under the

"regarded as" prong of the ADA to show the employer was aware of the plaintiff's

alleged impairment; rather, the plaintiff must demonstrate that, based on the perceived

impairment, the employer regarded the employee <u>"as disabled within the meaning of

the ADA</u>," and that such "perception caused the adverse employment action."  *Reeves*,

140 F.3d at 153 (quoting *Kelly v. Drexel Univ.*, 94 F.3d 102, 109 (3d Cir. 1996)

(underlining added)).  Thus, to be "regarded as" having an impairment, a plaintiff need

not necessarily be disabled within the meaning of the ADA; however, the employer

must perceive that the plaintiff is disabled "within the meaning of the ADA."  *Id.*

Circumstantial evidence may be considered in finding a *prima facie* case of

employment discrimination under the "regarded as" prong of the ADA.  *See Heyman v.

Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc.*, 198

F.3d 68, 73 (2d Cir. 1999).  In *Heyman*, the Second Circuit held that a reasonable trier

of fact could conclude by a preponderance of the evidence that the defendant regarded

the plaintiff, who suffered from lymphoma, a fact known to the employer, as having a

physical impairment that significantly restricted his ability to perform the major life activity of working, based on evidence that not long before the plaintiff's discharge, plaintiff's former manager had died from lymphoma, after missing a significant amount of work. *Heyman*, *supra*, 198 F.3d at 73.

In the instant case, Plaintiff asserts that Defendant perceived Plaintiff's morbid obesity to substantially limit major life activities such as walking, breathing, concentrating and working. Plaintiff's Memorandum at 16. To demonstrate the breadth of Defendants' discriminatory attitude against Plaintiff based on Plaintiff's obesity, Plaintiff points to the cartoon-like caricatures drawn by Captain Snyder which were hung in the Department's lunchroom and in Chief Camilleri's office, Plaintiff's Fact Statement ¶¶ 133, Defendants' Fact Statement ¶¶ 130; remarks regarding Plaintiff's inadequate personal hygiene and poor physical appearance on his annual evaluations, Weiss Affidavit, Exh. 42 (Deposition Exh. 101)); offensive name-calling by Plaintiff's co-workers, such as "Crisco" and "Omar the Tent Maker," Weiss Affidavit, Exh. I ("Arnet Deposition") at 50, Plaintiff's Fact Statement ¶ 141; Camilleri's own comments that Plaintiff is "lackadaisical" and could provide shade to co-workers while attending a Department picnic, Weiss Affidavit, Exh. G ("Jasinski Affidavit") at 185; Caruso Affidavit ¶ 42; Captain Jasinski's comparison of Plaintiff to a severely disabled Village resident who could not work, Weiss Affidavit, Exh. 23 ("Deposition Exh. 38"); and Jasinski's subsequent statement informing Plaintiff "the Department" wanted him working "as little as possible," Weiss Affidavit, Exh. 23 (Deposition Exh. 38), and, making refererence to two officers who were no longer employed by the Department, Jasinski's statement taunting Plaintiff, "two down and . . .." *Id.* Plaintiff also maintains Camilleri and the

Village's attorney stated that Plaintiff was unable to concentrate on tasks at hand. Plaintiff's Fact Statement ¶ 145.   According to Plaintiff, such evidence establishes *prima facie,* that Defendants regarded Plaintiff as unable to perform a sufficiently broad range of work to quash Defendants' perception of disability as actionable under the "regarded as" prong of the ADA.   Plaintiff's Memorandum at 22-23.

Defendants deny that they regarded Plaintiff as disabled within the meaning of the ADA, arguing that they were specifically notified following the physical examinations of Plaintiff by Drs. Penepent and Grippi in 1996, that Plaintiff did not suffer from a medically related disability.   Camilleri Deposition at 417.   Additionally, Defendants maintain that, regardless of any perceptions of disability Plaintiff seeks to attribute to Defendants, Plaintiff was not otherwise qualified to perform his job in December 2001 because, that "the ability to perform rapid deployment duties" was "an essential function of the [Village] police officer job," such as responding to an altercation or pursuing a fleeing felon.   Defendants' Memorandum at 34-35.

On this record the court must determine whether admissible evidence supports that Defendants perceived Plaintiff was limited in major life functions, including the ability to work in a wide range of jobs, by morbid obesity which had a physiological cause as, if Defendants did not, Plaintiff's claim that Defendants regarded Plaintiff as disabled within the meaning of the ADA must fail.   *Connor v. McDonald's Rest.*, 2003 WL 1343259 at * 3  (D.Conn. Mar. 19, 2003) (on motion to dismiss, "the issue is whether [Defendant] perceived [Plaintiff's] obesity as relating to a physiological impairment").   Here, although there is evidence that Defendants regarded Plaintiff as obese and that Defendants perceived Plaintiff as having difficulty walking and

breathing, concededly major life functions, no evidence in the record indicates that Defendants believed Plaintiff's morbid obesity was related to an uncorrectable physiological cause or that the obesity limited Plaintiff's ability to function in the general workplace. *See* Plaintiff's Memorandum at 16. Rather, Defendants' perceptions, even crediting Plaintiff's evidence most favorably to Plaintiff, were limited to Plaintiff's capacity to do his job as a Village police officer including Plaintiff's problems breathing and walking while on the job, and particularly, the ability to perform the RDT function successfully if needed in real-life situations. In short, while Defendants, especially Camilleri and other senior officers of the Department, were well aware Plaintiff had difficulty breathing and ambulating, such awareness exclusively related to Plaintiff's ability to perform his duties as a police officer, and not his off-duty, daily life activity. As such, the evidence relied upon by Plaintiff to meet the requirement that to be actionable under the ADA, the perceived impairment must be one that, as a result of Defendants' perception, appears to substantially limit a major life activity, is insufficient to avoid summary judgment. 29 C.F.R. § 1630.2(l).

Plaintiff's success in losing a significant amount of weight, 80 pounds, in a relatively short amount of time before his first retest, Defendants' Fact Statement ¶ 58, and an additional 25 pounds between the first and second retest, Complaint ¶ 28, achieving a total weight loss of approximately 105 pounds during his leave of absence demonstrates Plaintiff's ability to control his morbid obesity, and thus his ability to perform a broad range of work, including that of a police officer. As stated by the court in *Sutton*, *supra*, 527 U.S. at 482-83, a physical impairment which can be corrected "by medication or other measures" is not an impairment which "'substantially limits' a major

33

life activity." (underlining added).  Thus, even assuming that Defendants perceived Plaintiff to be disabled based on his obesity, no evidence tends to support that such perception resulted from Defendants' belief that Plaintiff suffered from an uncorrectable physiological condition or that Defendants regarded Plaintiff as unable to work in any capacity because of the alleged perception.  *Reeves, supra*; *Connor, supra*.

The examinations of Plaintiff by Dr. Grippi and Dr. Penepent in 1996, the results of which were known to Camilleri, yielded no evidence of such a physiological cause for Plaintiff's obesity in spite of Plaintiff's morbidly obese physical condition at the time of these examinations.  Doren Affidavit, Exh. 9 (Dr. Penepent letter to Camilleri and Dr. Grippi letter to Camilleri).  Moreover, no physician or other medical source has indicated that Plaintiff's ability to "perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities," 29 C.F.R. § 1630.2(j)(3)(i), has been significantly limited because of his weight.  Tellingly, Plaintiff himself maintains that his morbid obesity does not affect his ability to perform his duties as a patrolman, which negates Plaintiff's allegation that he is substantially limited in performing a major life activity, namely, working, by his disability.  Complaint ¶ 14; Plaintiff's Fact Statement ¶¶ 51, 93.  Indeed, Plaintiff returned to duty in April 2003 while weighing about the same as he did when Defendants forced him to take the unpaid leave of absence after failing the RDT practical exercise retest in March 2002, and has apparently continued to function as a Village patrol officer since his reinstatement on March 17, 2003 upon his successful completion of the RDT exercise retest in 2003.  Plaintiff presents no evidence that his obesity prevents his employment in any other area of work.  Thus, nothing in the record

34

supports finding that Plaintiff's disability "substantially limited" the major life activity of working.

Despite his excessive weight, Plaintiff at all times insisted that he was capable of performing his regular duties as a police officer, and maintained that his ability to perform his duties as a police officer was not hindered by his weight.  Complaint ¶ 14; Plaintiff's Fact Statement ¶¶ 51, 93.  Finally, although the incidents described by Plaintiff, including name-calling, offensive caricatures, and poor marks in hygiene and personal appearance on annual evaluations constituted evidence Defendants viewed Plaintiff as morbidly obese, as morbid obesity does not constitute a disability *per se*, *Francis,* 129 F.3d at 286; *Watkins Motor Lines,* 463 F.3d at 441, a reasonable trier of fact cannot conclude that these incidents establish that Defendants perceived Plaintiff as disabled based on such obesity.  Rather, the record establishes that Defendants only believed Plaintiff was unable to perform the complete range of duties of a police officer, specifically duties related to RDT. Defendants' Fact Statement ¶¶ 26, 79, 80, 91, 92, 98.  Plaintiff's theory of liability based on Defendants' regarding him as disabled, if accepted, would effectively extend the ADA's scope of disability beyond that established by controlling precedent.  See *Reeves, supra,* at 153 (for liability under the "regarded as" prong of the ADA, employer's perception of disability must be "within the meaning of the ADA.").  In sum, nothing in the record supports that Defendants believed Plaintiff's physical condition substantially limited one or more major life activities or was caused by a physiological or mental condition over which Plaintiff had no control.

The fact that Defendants refused to reassign Plaintiff to light-duty, assuming such light-duty work was even available, does not establish that Defendants regarded

Plaintiff as incapable of performing such jobs so as to avoid summary judgment.  In a similar case, where a police officer, who suffered from mental impairments following a brain injury, was denied his request to return to light duty, the court found that the defendants' failure to offer the officer a light duty position, regardless of whether such position existed, did not support a finding that the defendant regarded the plaintiff as "disabled from positions in related fields available to persons having comparable skills." *Pare v. City of Bristol*, 386 F.Supp. 2d 43, 51 (D.Conn 2005).

Likewise, in *Giordano v. City of New York*, 274 F.3d 740 (2d Cir. 2001), an ADA case where defendants conceded they acted to prevent plaintiff from acting in a "position of a full duty police officer, because . . . he [was] unable to safely perform the essential functions of [that position] without danger to himself or others," *Giordano, supra,* at 748, the court affirmed summary judgment against plaintiff, finding that defendants' belief that plaintiff was incapable of performing the duties of a full-duty police officer did not mean defendants "regarded [Plaintiff] as disabled from a "broad class" of jobs compared to "the average person having comparable training, skills, and abilities." *Id.* at 749.

As the Second Circuit explained

> The record contains no evidence from which we can infer that defendants thought, or had grounds for thinking, that other jobs in the public or private sector – such as, for example, a job as a security guard or private investigator, or with a police department that does not require every officer to be capable of patrol duty – carry the same nature or degree of risk . . ..

*Giordano, supra,* at 749.

The court, therefore, determined that plaintiff failed to establish, as was his burden, that

36

defendants improperly perceived Plaintiff was incapable of performing "a broad class of jobs." *Giordano, supra,* at 749-50.  In *Pare, supra,* the court also found that if defendants had no position available for which they believed plaintiff qualified, such fact does not establish defendants regarded plaintiff as disabled from other jobs "that involve comparable skills, training and ability." *Pare,* 386 F.Supp.2d at 50 *(*citing *Giordano, supra,* at 749).

Thus, in the instant case, Defendants' mere failure to offer "light duty" to Plaintiff does not constitute evidence that Defendants regarded Plaintiff as disabled sufficient to avoid summary judgment. *Giordano, supra,* at 749.  Further, Plaintiff has proffered no evidence demonstrating that alternative, "light-duty" positions were vacant and available at the time his request to be reassigned to such a position was allegedly denied by the Department, and Plaintiff points to no evidence from which it can be fairly inferred that Defendants believed Plaintiff was incapable of performing "a broad class of jobs," including any light-duty assignments he would have been assigned but for Defendants' perception regarding his obesity. *Giordano, supra,* at 749.

In sum, as Defendants had no reason to believe that Plaintiff's morbid obesity was caused by an uncontrollable medical condition, given Defendants' knowledge of Plaintiff's admitted ability to lose a significant amount of weight in order to successfully retake in 2003 the RDT exercise, the unexceptional evaluations regarding Plaintiff's health received from Dr. Grippi and Dr. Penepent in 1996 of which Defendants were also aware, and the absence of any medical diagnoses indicating otherwise, no admissible evidence in this record supports that  Defendants perceived Plaintiff as disabled within the meaning of the ADA because of Plaintiff's excessive weight.

Further, by failing to establish an issue of fact that morbid obesity is a disability under the ADA or one which Defendants perceived to substantially limit one or more of Plaintiff's major life activities, including a sufficiently broad range of work-related activity, Plaintiff fails to establish a *prima facie* claim of disability discrimination under the ADA, and summary judgment should be GRANTED on this ground.

### b.    Plaintiff's *Prima Facie* Showing of Defendant's Failure to Accommodate

Assuming Plaintiff had established his morbid obesity constitutes a disability under the ADA, or that Defendants improperly perceived him as impaired by some disability, to avoid summary judgment, Plaintiff must also demonstrate that he was otherwise qualified to perform the essential functions of his job, with or without a reasonable accommodation.  *Reeves,* 140 F.3d at 149-50.  Plaintiff maintains that he was capable, at all times, of performing the duties of a police officer, Caruso Affidavit ¶ 2, and contends that Defendants failed to provide a reasonable accommodation for his disability by refusing to transfer Plaintiff to a light-duty work position that would have been less physically demanding for Plaintiff, thereby placing Plaintiff on involuntary unpaid leave while losing weight in order to retake the RDT physical exercise. Complaint ¶¶ 19, 30.  Defendants maintain that they satisfied their obligation to provide Plaintiff a reasonable accommodation "by permitting Plaintiff to go out on a leave of absence to get into shape before retaking rapid deployment exercises and, in lieu of being brought up on Section 75 incompetence charges," with the consequent risk of a permanent loss of Plaintiff's position within the Department.  Defendants further submit

that Plaintiff was accommodated by permitting Plaintiff to use his accrued sick time

"even though his absence was not medically-related."  Defendants' Memorandum at 37

(referencing Defendants' Fact Statement ¶¶ 46-47).  Finally, Defendants assert that

they were not obligated to provide Plaintiff with the specific accommodations he

requested to comply with the ADA.  Defendants' Memorandum at 37.

The ADA prohibits employers from discriminating against an "otherwise qualified"

individual on the basis of his disability.  42 U.S.C. § 12112(b)(5)(A).  An employee who

cannot perform the essential functions of a job, either with or without a reasonable

accommodation, is not "otherwise qualified" for the job within the meaning of the ADA

because an employer is not required to eliminate the essential functions of the job in

order to accommodate the impaired employee.  *See Borkowski v. Valley Cent. Sch.*

*Dist.*, 63 F.3d 131, 140-42 (2d Cir. 1995) (tenured library teacher established that

accomodation would allow her to perform essential functions of her job).  Once an

employer learns of an employee's disabilities, however, to avoid ADA liability, the

employer has an "affirmative obligation to reasonably accommodate these known

disabilities," subject to such limitations as costs, and the unavailability of a reasonable

accommodation.  *Borkowski, supra*, at 143.  Among the accommodations an employee

can request is a transfer into a vacant position which the employee can perform.

*Jackan v. N.Y.  Dep't. of Labor*, 205 F.3d 562, 565-66 (2d Cir. 2000).  The burden of

establishing the existence of such a vacancy, however, rests on the employee.  *Id.* at

566.

The Second Circuit has held that to make out a *prima facie* case of employment

discrimination based on a failure to provide reasonable accommodation as required by

the ADA, the plaintiff must show "either that [he] can perform the essential functions of the job without accommodation or that [he] can do so with reasonable accommodation and that the employer refused to make such an accommodation."  *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 99 (2d Cir. 1999).  The relevant regulation provides in pertinent part that

> The term reasonable accommodation means
>
> * * *
>
> (ii)  Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position; or
> (iii) Modifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities.

29 C.F.R. § 1630.2(o)(1)(i).

Further, "reasonable accommodations" may include "reassignment to a vacant position; acquisition or modifications of equipment or devices . . . ."  29 C.F.R. § 1630.2(o)(2)(ii).

Here, Plaintiff has failed to meet his burden establishing that there were vacant, light-duty positions at the time his request for reassignment to light-duty was denied by the Department.  *See Jackan,* 205 F.3d at 566.  Further, Defendants had no affirmative obligation to accommodate Plaintiff's alleged disability because there is no evidence from which a reasonable juror could conclude that Plaintiff's morbid obesity has a physiological cause or otherwise constitutes a disability under the ADA.  *Discussion, supra,* at 34-35.  Relevantly, the ADA does not require employers to provide employees with the particular accommodation the employee requests "so long as the accommodation provided is reasonable*." Fink v. N.Y. City Dep't. of Personnel*, 53 F.3d

565, 567 (2d Cir. 1995) (construing the Rehabilitation Act); *see also Trobia v.*

*Henderson,* 315 F.Supp.2d 322, 326, 333 (W.D.N.Y. 2004) (ADA and Rehabilitation Act

claims are subject to the same analysis).

> Accordingly, to prevail on an ADA claim where the employer has offered reassignment as a reasonable accommodation, the employee must offer evidence showing both that the position offered was inferior to [his] former job and that a comparable position, for which the employee was qualified, was open.  This dual burden limits an employer's obligations with respect to reassignment as a method of reasonable accommodation.

*Norville,* 196 F.3d at 99.

Here, although unpaid leave is arguably inferior to paid employment as an active patrol

officer, Plaintiff has offered no evidence that any light-duty position was available, that

reassignment to light-duty is comparable to the patrol officer position, or that Plaintiff

was qualified for employment as a light-duty police officer.  Specifically, Plaintiff does

not establish that he would not be required, even as a police officer on light-duty, to

respond to emergencies, including active shooter situations, requiring use of rapid

deployment techniques, should they arise.  In fact, Plaintiff admits that participating in

the rapid deployment mode when necessary to protect people and property is an

essential job function of a police officer, as would be responding to potentially armed

assailants.  Caruso Deposition at 257-59.  Given that Plaintiff has not established that

there were any light-duty positions available at the time he was placed on unpaid leave

or that he would not be required to assist patrol officers using rapid deployment

methods against an active shooter situation, a reasonable fact trier could not determine

the reasonableness of reassigning Plaintiff to light-duty.  See 29 C.F.R. Pt. 1630, App.

§ 1630.9.

Additionally, Plaintiff has not shown the existence of a material issue of fact that he is "otherwise qualified" to perform the essential functions of his job.  Although Plaintiff claims his performance in two of three components of the RDT physical exercises on December 5, 2001 was satisfactory, he cannot and does not contradict that, on criteria relating to stamina and discipline, Plaintiff's ability was fairly evaluated as compared to others.  Further, nothing in the record supports a finding that successful completion of two of three RDT exercises equals substantial completion of such RDT exercise for Defendants.  Plaintiff offers no evidence contradicting that Defendants required substantial completion of all three RDT exercises, because of the volatile nature of the situation officers engaging in true rapid deployment may face, was unreasonable.

Additionally, Plaintiff's assertion that he was, at all times, capable of executing the duties of a police officer effectively negates his further assertion that Defendants failed to accommodate his disability.  Complaint ¶ 14.  In particular, Plaintiff does not allege that he was unable to perform his job as a police officer without a reasonable accommodation.  Rather, Plaintiff insists he was at all times capable of executing his job duties despite his obesity.  Plaintiff's Memorandum at 2.  This concession is fatal to Plaintiff's claim of denying Plaintiff a reasonable accommodation because, as Plaintiff alleges he was not hindered from performing his job duties, including rapid deployment action, by his obesity, Plaintiff acknowledges he did not require any accommodation, reasonable or not.  As Defendants and Plaintiff agree that Plaintiff did not require any accommodation to perform the essential duties of a police officer, Plaintiff cannot be

found to be an individual with a disability who is "otherwise qualified" to perform such duties whom Defendants failed to reasonably accommodate.  Moreover, Plaintiff has failed to raise any issue that but for Defendants' failure to give Plaintiff a light-duty assignment, Plaintiff would have been enabled to pass the RDT exercise re-test at any earlier time.  Accordingly, summary judgment should be GRANTED on Plaintiff's claim that he was denied a reasonable accommodation.

### c.   Plaintiff's *Prima Facie* Case of Defendant's Retaliation

Plaintiff alleges that Defendants discriminated against him in violation of the ADA and NYHRL by retaliating against him for filing a prior EEOC complaint.  Complaint ¶ 49 (ADA); ¶ 62 (NYHRL), Fact Statements ¶¶ 102.  Specifically, Plaintiff alleges that Defendants interrogated him regarding potential disciplinary matters, including the CPS investigation, and took disciplinary measures against him, which included postponing Plaintiff's § 207(c) benefits as a result of an injury acquired in the line of duty.  Plaintiff's Memorandum at 33.  Defendants maintain that they had legitimate, nondiscriminatory reasons for these actions against Plaintiff, and that, in any event, Plaintiff has failed to establish a *prima facie* case of retaliation.  Defendants' Fact Statement ¶¶ 103-119.

The ADA prohibits retaliation by an employer against its employees in relation to a disability discrimination claim by specifically providing that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203(a).  The elements of a retaliation claim

under the ADA include

> "(i) a plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was engaged in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action."

*Weixel v. Bd. of Educ. of City of N.Y.*, 287 F.3d 138, 148 (2d Cir. 2002).

Courts have held that a non-disabled employee is nonetheless protected against retaliation for even mistakenly requesting a reasonable accommodation provided the employee made a good faith request for a reasonable accommodation. *Conley v. United Parcel Service*, 88 F.Supp.2d 16, 20 (E.D.N.Y. 2000) (citing cases). The Second Circuit has held that a non-disabled individual who files a complaint of disability discrimination is engaging in activity protected under the ADA "so long as he can establish that he possessed a 'good faith, reasonable belief that the underlying challenged actions of the employer violated the law.'" *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999) (quoting *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998)); *see also Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (same).

Plaintiff's contention that the Department retaliated against Plaintiff for filing, on September 25, 2002, the initial charge of disability discrimination with the NYSDHR by threatening to discipline Plaintiff for failing to follow the chain of command by communicating with the Village Clerk regarding Plaintiff's benefits while on unpaid leave is without merit. Specifically, Plaintiff received a written warning from Defendants, in June 2002, prior to filing Plaintiff's initial discrimination charge, advising Plaintiff that

Plaintiff's failure to follow the Department's chain of command would be dealt with when he returned to work.  Defendants' Fact Statement ¶¶ 101-03; Defendants' Memorandum at 21-22.  As such, the formal written warning Plaintiff received in May 2003, upon his return to work, consistent with the pre-charge notice received by Plaintiff in June of 2002, cannot constitute actionable retaliation, incidental to Plaintiff's failing to complete the December 2001 RDT practical exercise.  Also, Defendants' placing Plaintiff on an unpaid, forced leave of absence does not constitute evidence of retaliation against Plaintiff because such leave commenced on or about December 26, 2001, well before filing charges on September 25, 2002, against Defendants. Complaint ¶¶ 7, 18; Defendants' Fact Statement ¶¶ 45, 101.  Defendants motion for summary judgment on Plaintiff's retaliation charge, based on these allegations, should therefore be GRANTED.

Defendants' remaining acts, as alleged by Plaintiff in support of the retaliation claim, included attempts to retaliate against Plaintiff for filing discrimination charges, and occurred after the initial charge of discrimination was filed by Plaintiff.  As such, the court must determine whether such conduct constitutes evidence raising material issues of fact of actionable retaliation.  As stated, Discussion, *supra,* at 41-42, a *prima facie* case of retaliation is established if Plaintiff was engaged in a protected activity, if Defendants knew of Plaintiff's activity and made a decision or pursued action which was adverse to Plaintiff, and if the protected activity caused Defendants' adverse action. *Weixel*, 287 F.3d at 148.

Under the ADA, 42 U.S.C. § 12203(a), filing charges of discrimination is a protected activity.  *Kotlowski v. Eastman Kodak Co.*, 922 F.Supp. 790, 802 (W.D.N.Y.

1996).  Further, it is undisputed that Defendants knew of the discrimination charge filed

against them by Plaintiff in that Plaintiff served the Village with an Amended Notice of

Claim, received by the Deputy Clerk for the Village on September 18, 2002.  Doren

Affidavit, Exh. 16.   Defendants were also served by facsimile, on September 25, 2002,

at approximately 3:56 p.m., with a copy of the complaint Plaintiff filed with the New York

State Division of Human Rights ("NYDHR"), charging Defendants with job discrimination

against Plaintiff.  Doren Affidavit, Exh. 17.  Plaintiff has thus satisfied the first and

second elements of his retaliation claim.

As relevant to the adverse action prong of Plaintiff's retaliation claim, Plaintiff

asserts that Defendants retaliated against him by investigating him for having engaged

in outside employment without obtaining the Department's prior permission, and

questioning Plaintiff concerning his knowledge of an ongoing CPS investigation

involving him, without pursuing disciplinary action, as well as Defendants'

postponement of state workers' compensation benefits to which Plaintiff was entitled,

present triable issues as to whether these actions taken by Defendants would have

dissuaded a reasonable employee from pursuing the unlawful discrimination claim

against Defendants.  *Burlington N. and Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405,

2407 (2006) (retaliation claims not limited to actions affecting terms and conditions of

employment); *Kessler v. Westchester County Dept. of Soc. Servs.*, 461 F.3d 199, 208-

09 (2d Cir. 2006) (where reasonable employee in Plaintiff's position may be dissuaded

from filing discrimination charge against employer based on employer's actions, such

actions may constitute actionable retaliation).  On this record, the court finds a

reasonable juror could find that such actions would have persuaded a reasonable

46

employee to discontinue his discrimination claim, and, as such, the alleged actions are sufficiently adverse to satisfy the third element of Plaintiff's retaliation claim.  *White, supra,* at 2415-416.

As stated, Discussion, *supra,* at 37, Plaintiff must also establish a causal connection between the protected activity and the adverse employment action to successfully allege a *prima facie* claim for retaliation.  "A causal connection may be established indirectly by showing that the protected activity was followed closely in time by the adverse action."  *Jones v. Potter*, 2004 WL 625276 at * 6 ((internal quotation omitted) (quoting *Reed v. A.W. Lawrence & Co., Inc.,* 95 F.3d 1170, 1178 (2d Cir. 1996)).  In the Second Circuit, there is no bright-line rule which identifies the point at which  temporal proximity between filing a discrimination charge against an employer and the employer's alleged adverse employment action becomes too attenuated, on summary judgment, to sustain a charge of retaliation. *Gormon-Bakos v. Cornell Coop. Extension of Schenectady County*, 252 F.3d 545, 554-55 (2d Cir. 2001) (citing cases); *Jones, supra,* at 6;.

Proof of a causal connection can also be established indirectly through evidence such as an employer's disparate treatment of fellow employees who engaged in similar conduct, or directly through evidence of palpable retaliatory animus directed against a plaintiff by the defendant.  *DeCintio v. Westchester County Med. Ctr.,* 821 F.2d 111, 115 (2d Cir. 1987).  On summary judgment, direct or circumstantial evidence sufficient to give rise to an inference of retaliation must show circumstances sufficient to permit a rational finder of fact to infer a retaliatory motive.  *LaFond v. Gen. Physics Servs. Corp.,* 50 F.3d 165, 173 (2d Cir. 1995).

47

Here, Plaintiff has submitted sufficient indirect evidence of Defendants'
retaliatory animus by identifying other, similarly situated employees who were
disparately treated by Defendants.  In particular, Plaintiff contends that the Department
did not prohibit Village Police Officer Sheila Kirsch from assisting in an actual
emergency requiring the police to employ rapid deployment skills before she completed
rapid deployment training.  Qualey Deposition at 196-209; *but see* Camilleri Deposition
at 527-32 (Kirsch was recovering from knee surgery).  Regarding the delayed receipt of
his state-mandated compensation benefits, Plaintiff points to the fact that no other
Village police officer injured in the line of duty "was subject to the same restrictions."
Caruso Deposition at 447.  Additionally, Plaintiff maintains that only one other Village
police officer was censured for violating chain of command procedures and, whereas
Plaintiff received a written letter of censure for his alleged violation, the other police
officer received a verbal warning, a lesser sanction that the trier of fact could
reasonably find to be probative evidence of disparate treatment.  Plaintiff's Fact
Statement ¶ 107; Caruso Affidavit ¶ 37; *see also* Doc. No. 77 (sealed document).
Finally, Plaintiff submits that he was questioned about an alleged CPS investigation,
which, according to Plaintiff, Assistant Chief LaCorte knew was "unfounded."  *Id.* ¶¶
112, 114 (referencing Weiss Affidavit, Exhs. 27 & 28 (Deposition Exhs. 61-62)).  Should
the jury find that Defendants acted against Plaintiff on the basis of a false CPS
investigation and that Defendants knew or reasonably should have been aware of such
falsity, the jury could also find Defendants' actions the product of a retaliatory motive.
As such, Plaintiff's indirect and circumstantial evidence of disparate treatment is
sufficient to defeat Defendants' motion.  Moreover, the court finds the temporal

proximity of Defendants' actions in relation to the date Plaintiff filed his complaint with NYDHR was not so limited, as a matter of law, as to avoid summary judgment. *Gormon-Bakos*, 252 F.3d 545, 554 (2d Cir. 2001) (no bright line rule in this Circuit defining outer limit of temporal proximity); *Richardson v. New York State Dep't of Correctional Services*, 180 F.3d 426, 446-47 (2d Cir. 1999) (adverse employment action less than one month after  deposition notice was received may constitute retaliation for lawsuit instituted more than one year prior).  Therefore, summary judgment on Plaintiff's retaliation claim should be GRANTED in part, and DENIED in part.

### d.    Plaintiff's *Prima Facie* Case of Employment-Related Harassment

Plaintiff alleges that Defendants harassed him because of his obesity or otherwise created a hostile work environment by condoning harassing behavior on the part of Departmental employees directed to Plaintiff on account of his physical appearance based on Plaintiff's perceived obesity.  Complaint ¶¶ 52-55; Plaintiff's Memorandum at 21-22.  Defendants seek summary judgment on Plaintiff's harassment claim arguing that the Second Circuit has not determined whether a hostile work environment action may be brought under the ADA, Defendants' Memorandum at 38, but even if such cause of action is permitted, according to Defendants, "the harassment alleged by Plaintiff does not give rise to an actionable hostile work environment claim." Defendant's Memorandum at 40.

"Although the Second Circuit has not determined whether the ADA gives rise to a cause of action for hostile work environments," *Balonze v. Town Fair Tire Ctrs., Inc.,*

2005 WL 752198 at * 8 (D.Conn. 2005), courts which recognize hostile work environment claims under the ADA apply the same analysis as in Title VII cases to determine its validity.  However, district courts within this circuit have so held.  *See Hendler v. Intelecom USA, Inc.*, 963 F.Supp. 200, 208 (E.D.N.Y. 1997) (recognizing a hostile work environment claim under the ADA).  To state a claim of hostile work environment under Title VII, a plaintiff must establish that the alleged harassment "creates an objectively hostile or abusive work environment and that the putative victim subjectively perceives the environment to be abusive." *Id.* (citing *Haysman v. Food Lion, Inc.*, 893 F.Supp. 1092, 1107 (S.D.Ga. 1995)).

As a threshold matter, as the court has determined that Plaintiff has not established that he is a qualified person with a disability under the ADA, Plaintiff's hostile work environment claim based on his alleged disability must also fail.  *See Cooney v. Consol. Edison*, 220 F.Supp.2d 241, 253 (S.D.N.Y. 2002) (one element of plaintiff's hostile work environment claim is that plaintiff was harassed because of his disability); *see also Williamson v. Int'l Paper Co.*, 85 F.Supp.2d 1199, 1201 ("to establish a *prima facie* case of disability harassment, plaintiff must present evidence, *inter alia*, that his employer regarded him as "disabled.").  Defendants have not argued that as Plaintiff is not considered disabled under the ADA, Plaintiff cannot assert a claim of hostile work environment based on Plaintiff's alleged disability.  However, it is incumbent upon the court to correctly decide this issue under applicable law, *U.S. National Bank of Oregon v. Independent Insurance Agents of America, Inc.*, 508 U.S. 439, 446 (1993) (court is not limited to legal theories advanced by parties, but retains independent power to identify and apply proper construction of governing law), *i.e.*, no

hostile work environment claim based on the ADA exists unless Plaintiff is disabled as defined by the ADA. *See Cooney, supra; Williamson, supra.*  Accordingly, summary judgment should be GRANTED as to Plaintiff's hostile work-place and harassment claims.

Alternatively, should the District Judge find that, notwithstanding the undersigned's contrary recommendation, Discussion, *supra,* at 26-37, Plaintiff has successfully alleged a disability discrimination claim under the ADA, Defendant's motion on Plaintiff's hostile work environment claim, based on a qualified disability under the ADA, should be DENIED.

A claim of discriminatory harassment based on a hostile work environment arises when a plaintiff alleges "(1) that his workplace was permeated with discriminatory intimidation was [*sic*] sufficiently severe or pervasive to alter the conditions of his work environment and (2) that a specific basis exists for imputing the conduct that created the hostile work environment to the employer." *Hendler, supra,* at 209 (citing *Murray v. N.Y. Univ. Coll. of Dentistry*, 57 F.3d 243, 249 (2d Cir. 1995) (citing *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 20-22 (1993)).

To determine whether the conditions are so severe or pervasive as to alter the terms and conditions of employment, the court must consider the following factors: 1) the frequency of the discriminatory conduct; 2) its severity; 3) whether the conduct was physically threatening or humiliating, or a mere "offensive utterance"; 4) whether the conduct unreasonably interfered with plaintiff's work; and 5) what psychological harm, if any, resulted from the conduct.  *Harris,* 510 U.S. 17 at 23;  *Richardson v. N.Y. Dep't. of Corr. Servs.,* 180 F.3d 426, 437 (2d Cir. 1999), *abrogated by Burlington N. and Santa*

*Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2407 (2006) (retaliation claims not limited to actions affecting terms and conditions of employment).  If the challenged action could have "dissuaded a reasonable worker from making or supporting a charge of discrimination," *White, supra,* at 2407, plaintiff has presented evidence creating a triable issue of fact, requiring that the court deny defendant's summary judgment motion on this ground.  *Kessler,* 461 F.3d at 207-09.   The totality of the circumstances must be considered in determining whether workplace harassment is actionable.  *Balonze, supra*, at * 8 (citing *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 767-68 (2d Cir. 1998)).

Isolated and occasional instances of harassment, unless extremely serious, do not alter the conditions of the working environment.  *Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir. 1992).  To withstand summary judgment, plaintiff must demonstrate either that a single incident was "extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted" to have altered the conditions of the working environment.  *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 570 (2d Cir. 2000).  The test is whether "the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse."  *Torres v. Pisano,* 116 F.3d 625, 632 (2d Cir.).

In the instant case, the court finds a reasonable juror could determine that admissible evidence in this record demonstrates pervasive and severe insulting comments and cartoon-like caricatures related to Plaintiff's physical appearance amounted to a material  adverse effect on Plaintiff's conditions of employment, based on their frequency, severity, and humiliating nature, including, surprisingly, the alleged

condoning by Camilleri, the Village's Chief of Police, of such unprofessional misconduct causing Plaintiff as a reasonable employee to be distracted from his work and to suffer significant psychological harm, thereby constituting material and adverse alteration of Plaintiff's working conditions. *Harris, supra,* at 23. Moreover, Plaintiff's evidence that Camilleri failed to discipline or Captain Snyder about the caricatures of Plaintiff, created and publicized by Snyder, that achieved a recognized degree of notoriety within the Department, that Camilleri uttered offensive comments regarding Plaintiff's obesity at the Department's summer picnic, and that one cartoon-like caricature graphically depicting Plaintiff as obese, was displayed in Camilleri's office while Plaintiff was on leave, could lead a reasonable juror to impute such knowledge to the Village as Plaintiff's employer.

The trier of fact might also reasonably determine that Defendants condoned such hostile work environment based on evidence in the record, admissible under Fed.R.Evid. 801(d)(2)(D), as an admission by a party's agent, that Village Mayor John Beaumont supported terminating Plaintiff as a Village employee based primarily on Plaintiff's excessive weight and Plaintiff's inability to perform the rapid deployment exercise. Weiss Affidavit, Exh. 10 (Deposition Exh. 74 at 6-30, 16-30). As additional evidence of discriminatory animus, the trier of fact may also consider the expected testimony by Plaintiff's neighbor, Kimberly Smith, describing how the Department aggressively sought information from her to use against Caruso to justify Defendants' efforts to terminate his employment, including La Corte's request that Smith report to La Corte any unfavorable information concerning Plaintiff's off-duty conduct. Smith Affidavit at 2. Given that the record in this case is replete with instances of Defendants'

insulting and abusive conduct directed toward Plaintiff, with the apparent objective of driving him out of the Department because of Plaintiff's excessive weight, Defendants' motion directed to Plaintiff's harassment and hostile work environment claims should, in the alternative, be DENIED.

### e.    Plaintiff's NYHRL Claims

Assuming, *arguendo*, the District Judge agrees with the recommendation that summary judgment be granted in favor of Plaintiff on the ADA retaliation claims, or disagrees with the recommendation that summary judgment be granted in favor of Defendant on the remaining ADA claims, then the court would retain subject matter jurisdiction over at least one of Plaintiff's federal claims.  In that case, Plaintiff's state NYHRL law claims[14]  would be before the court pursuant to supplemental jurisdiction under 28 U.S.C. § 1367(a).  Nevertheless, should the District Judge grant summary judgment in favor of Defendants on all Plaintiff's ADA claims, then the court should refrain, as Defendants request, Defendants' Memorandum at 49-50, from exercising supplemental jurisdiction over Plaintiff's NYHRL claims.

Generally, a district court may decline to exercise supplemental jurisdiction over a state law claim where (1) the court has dismissed all claims over which it has original jurisdiction, *i.e.*, the federal claims, based on the ADA, or (2) in exceptional circumstances, where there are other compelling reasons for declining jurisdiction.  28 U.S.C. § 1367(c)(2),(3).  "[T]the discretion implicit in the word 'may' in subdivision (c) of

---

[14] In the Complaint, Plaintiff alleges Defendants violated the NYHRL by failing to accommodate his disability and placing him on forced leave of absence without pay (Fourth Cause of Action), retaliating against him for filing the prior NYHRL complaint by interrogating him about potential disciplinary matters, withholding a portion of Plaintiff's salary and taking disciplinary action against him (Fifth Cause of Action), and creating a hostile work environment (Sixth Cause of Action).

§ 1367 permits the district court to weigh and balance several factors, including considerations of judicial economy, convenience and fairness to litigants." *Purgess v. Sharrock*, 33 F.3d 134, 138 (2d Cir. 1994) (citing *Castellano v. Bd. of Tr.*, 937 F.2d 752, 758 (2d Cir. 1991)).  Where "dismissal of the federal claim occurs 'late in the action, after there has been substantial expenditure in time, effort, and money in preparing the dependent claims, knocking them down with a belated rejection of supplemental jurisdiction may not be fair.  Nor is it by any means necessary.'" *Purgess*,  33 F.3d at 138 (quoting 28 U.S.C. § 1367, Practice Commentary (1993) at 835).

The Second Circuit has found that the district court abused its discretion by exercising supplemental jurisdiction over state law claims, despite the dismissal of all federal claims, "where the federal claims had been dismissed at a relatively <u>early</u> state and the remaining claims involved issues of state law that were unsettled."  *Valencia ex. rel. Franco v. Lee*, 316 F.3d 299, 306 (2d Cir. 2003) (underlining added) (citing *Giordano v. City of N.Y.*, 274 F.3d 740, 754 (2d Cir. 2001)); *see also Oliveira v. Frito-Lay, Inc.*, 251 F.3d 56, 64 (2d Cir. 2001); *Seabrook v. Jacobson*, 153 F.3d 70, 71-73 (2d Cir. 1998)).  In contrast, the Second Circuit has affirmed a district court's decision to retain state claims after dismissing all federal claims where the question arises late in the proceedings.  *See Purgess v. Sharrock*, 33 F.3d 134, 139 (2d Cir. 1994) (holding district court did not abuse its discretion by exercising supplemental jurisdiction over state claims where four of five federal claims were dismissed on the eve of trial, final federal claim was dismissed after the close of all the evidence, the parties had spent years preparing for trial in federal court, jury had heard evidence for several days and was ready to begin deliberations, and it would have been wasteful to subject case to

another full trial before a different tribunal).

Here, although the instant case was commenced more than three years ago, the court, the docket shows that for a substantial amount of time that the action has been pending was spent either in settlement discussions or discovery motions.  This action thus is, procedurally, "at a relatively early state," *Valencia ex. rel. Franco*, 316 F.3d at 306, such that the court's dismissal of the pendent state claims, should all Plaintiff's federal claims be dismissed, would not be an abuse of discretion.  *Id*. [15]

Nevertheless, assuming the District Judge retains jurisdiction over at least one of Plaintiff's federal ADA claims for trial, *i.e.*, Plaintiff's retaliation claim, the court then has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over Plaintiff's state claims. Significantly, because "disability" is more broadly defined under the NYHRL than the ADA, *Reeves v. Johnson Controls World Servs., Inc*. 140 F.3d 144, 155-56 and n. 9 (2d Cir. 1998) (observing difference between definition of "disability" under ADA and NYHRL, but otherwise applying same standards used to evaluate ADA claims to NYHRL claims), on this record, a reasonable juror could find that Plaintiff qualifies as having a disability under the NYHRL and, based on such disability, a reasonable trier of fact may also find Plaintiff was, based on the plethora of work-related abuse, based on his obesity, Plaintiff suffered at the hands of Defendants, subjected to a hostile work environment.  Therefore, in order to allow the parties the opportunity to litigate all colorable claims relative to the instant action in a single trial, to avoid potentially

---

[15] The court takes no position on the effect of the November 23, 2005 Order precluding the testimony of Plaintiff's expert witness Dr. Dandano (Doc. No. 94), regarding an endocrinological cause for Plaintiff's obesity in a subsequent action commenced in New York Supreme Court on the state NYHRL claims, and thus the potential availability of such expert opinion in the state court action.

inconsistent verdicts or judicial decisions, or burdening the parties with separate trials, the court recommends that supplemental jurisdiction be exercised over Plaintiff's state disability discrimination claims in this action.

### 1.    Disability Discrimination under the NYHRL

The *McDonnell Douglas* burden-shifting analysis applies to employment discrimination claims based on disability whether brought pursuant to the ADA or to NYHRL. *Cruz, supra*, 202 F.3d at 565 n. 1. "Disability" is more broadly defined under the NYHRL than the ADA because, unlike the ADA, the NYHRL does not require the employee to demonstrate that a physical or mental impairment substantially impairs a major life activity, rather the NYHRL requires only that the disability is a "demonstrable impairment." *Matya v. Dexter Corp.*, 2006 WL 931870 at * 8 (W.D.N.Y. 2006) (citing *Reeves*, 140 F.3d at 154)). Specifically, under the NYHRL, a Plaintiff is disabled if he suffers from (1) a physical, mental or medical impairment of "anotomical, physiological, genetic or neurological" origin which impairs normal bodily functions or is established through medically accepted techniques, (2) "a record of such an impairment," or (3) a condition which others perceive impairs the Plaintiff. N.Y. Exec. Law § 292.21 (McKinney's 1993); *Reeves*, *supra*, 140 F.3d at 155 (quoting N.Y. Exec. Law § 292.21). As such, a "literal reading of the statute [N.Y. Exec. Law § 292.21], taking no account of the seemingly clear legislative purpose to enact a definition of disability coextensive with comparable federal statutes, treats a medically diagnosable impairment as . . . a disability for purposes of the [NYHRL]." *Reeves*, *supra*, at 155; *see also Treglia v. Town of Manlius,* 313 F.3d 713, 723 (2d Cir. 2002) (NYHRL covers "diagnosable

medical anomalies" which may lead to more serious conditions).

Plaintiff has alleged in the Fourth Cause of Action that Defendants discriminated against him based on his disability in violation of the NYHRL.  Complaint ¶ 58.  Upon exercising supplemental jurisdiction, the court must therefore consider whether Plaintiff's alleged morbid obesity qualifies as a disability for purposes of the NYHRL, regardless of the court's finding and recommendation, Discussion, *supra,* at 26-27, that such excessive weight does not qualify for protection as a disability under the ADA. Based on the evidence in this record, specifically, that Drs. Grippi and Penepent's diagnosis that Plaintiff was morbidly obese, a condition recognized by the medical professionals upon reaching a certain body mass, as reflected in the BMI, Weiss Affidavit, Exh. 2, Plaintiff's disability discrimination claims under the NYHRL is actionable, and Defendant's motion should be DENIED as to this cause of action.

However, in the instant case, insofar as Plaintiff is not "a qualified individual with a disability" under the ADA, *Discussion, supra*, at 41-42, his NYHRL claim should nevertheless be dismissed.  *Altman v. N.Y. City Health & Hosp. Corp.,* 100 F.3d 1054, 1061 (2d Cir. 1996) (court properly dismissed plaintiff's NYHRL claim where plaintiff was not, under the ADA,  "qualified individual with a disability," insofar as plaintiff's disability prevented him from reasonably executing his job duties)*; Adams v. Master Carvers of Jamestown, Ltd.,* 2002 WL 31194562 at * 5 (W.D.N.Y. 2002), *rev'd and remanded on other grounds*, 91 Fed.Appx. 718 (2d Cir. 2004).  Nevertheless, should District Judge Arcara find that Plaintiff is a "qualified individual with a disability" under the ADA, Plaintiff's NYHRL disability claim also fails as Plaintiff adduces no evidence to demonstrate how he is "medically incapable" of meeting the Department's physical

conditioning requirement.  *See Reeves,* 140 F.3d at 156 (where complainants

demonstrate they are medically unable to lose weight as a result of a diagnosed

medical condition, they may be disabled under NYHRL)*; Alesci v. N.Y.  Div. of Human

Rights,* 689 N.E.2d 898, 902 (N.Y. 1997) (flight attendants were not disabled under the

NYHRL because they offered no evidence to establish they were "medically incapable"

of meeting airline's weight requirements); *compare State Div. of Human Rights v. Xerox

Corp.,* 480 N.E.2d 695, 697 (N.Y. 1985) (plaintiff was, under the NYHRL, impaired, as

physician determined "gross obesity" rendered her "medically unsuitable" for

employment with Xerox).  In the case at bar, Plaintiff demonstrated that he was able to

lose a significant amount of weight without medical intervention or the assistance of

drugs. *Facts, supra,* at 14; *Discussion, supra,* at 32-33.   Therefore, although an

actionable "disability" is more broadly defined under the NYHRL than the ADA, Plaintiff

fails, as a matter of law, to make a *prima facie* case of disability discrimination under

the NYHRL.  Defendants' motion for summary judgment on Plaintiff's Fourth Cause of

Action should, therefore, be GRANTED.


### 2.        Retaliation under the NYHRL

In his Fifth Cause of Action, Plaintiff alleges that Defendants retaliated against

him, in violation of NYHRL by "interrogating him regarding potential disciplinary matters,

and taking disciplinary action against him and by withholding a portion of his salary

while receiving [his state-mandated workers compensation] benefits."  Complaint ¶ 62.

Plaintiff's retaliation claim under the NYHRL is subject to the same analysis as

Plaintiff's retaliation claim under the ADA.  *Weissman v. Dawn Joy Fashions, Inc.,* 214

F.3d 224, 234 (2d Cir. 2000) (applying same analysis to ADA and NYHRL retaliation claims); *Murphy v. Bd. of Educ. of Rochester City Sch. Dist.,* 273 F.Supp.2d 292, 321 (W.D.N.Y. 2003) (citing *Treglia v. Town of Manilus*, 313 F.3d 713, 719 (2d Cir. 2002) ("Claims for retaliation [under the ADA, Rehabilitation Act and NYHRL] are analyzed under the same burden-shifting framework established for Title VII cases").  Thus, insofar as the court has recommended that Defendants' motion for summary judgment on Plaintiff's retaliation claims under the ADA, upon these grounds, be DENIED in part, Discussion, *supra,* at 36-42, the court also recommends that the court exercise supplemental jurisdiction over Plaintiff's NYHRL claims, and, accordingly, that Defendants' motion for summary judgment on Plaintiff's retaliation claims pursuant to the NYHRL likewise be DENIED in part.

### 3.      Hostile Work Environment under the NYHRL

Plaintiff alleges in his Sixth Cause of Action that Defendants violated the NYHRL by creating a hostile work environment.  Complaint ¶ 65.  As with Plaintiff's retaliation claim under the NYHRL, determining the viability of Plaintiff's hostile work environment claim under the NYHRL "parallels the analysis used in Title VII claims."  *Mack v. Otis Elevator Co.*, 326 F.3d 116, 122 n. 2 (2d Cir. 2003) (quoting *Cruz,* 202 F.3d at 565 n. 1 (2d Cir. 2000)).  Having found, Discussion, *supra,* at 50, that  Plaintiff's employment-related harassment claim under the ADA must fail because Plaintiff does not have a disability under the ADA, Discussion, *supra,* at 26-37 (citing cases), as Plaintiff cannot prove a disability under the NYHRL, Plaintiff's claim that he was subjected to a hostile work environment based on his disability as defined by the NYHRL also must fail.

Should the District Judge determine, however, that Plaintiff is disabled under the NYHRL, Defendant's motion for summary judgment on Plaintiff's hostile work environment claim under the NYHRL should, in that event, be DENIED, as a reasonable juror could find that a reasonable employee in Plaintiff's situation would reasonably find the employment-related harassment inflicted upon Plaintiff, based on his obesity, by  Defendants, particularly as condoned by Camilleri and other senior officers of the Department, was severe enough to adversely alter Plaintiff's work conditions.  *See Torres, supra,* at 632.

### f.    Defendants' Statute of Limitations Defense [16]

Defendants maintain that Plaintiff's allegation occurring 300 days before Plaintiff filed his DHR charge are barred by the applicable statute of limitations.  Defendants' Memorandum at 48.  Defendants contend that Plaintiff's asserted instances of discrimination in 1995, 1997 and 1999 when Defendants allegedly disciplined him, are time-barred.[17]  *Id.* at 49.  Defendants also maintain that the promotions Plaintiff alleges Defendants denied to him in 1999 and 2001, as well as Plaintiff's hostile work environment claims, are time-barred.  *Id.*   Specifically, Defendants contend Plaintiff's

---

[16] As the statute of limitations for Plaintiff's HRL hostile work environment claim is three years from the alleged discriminatory act, Defendant's statute of limitations defense is limited to Plaintiff's hostile work environment claim under the ADA.  *See Moll v. Telesector Resources Group, Inc.*, 2005 WL 2405999 at * 11 (W.D.N.Y. 2005) (citing *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 714 (2d Cir. 1996) ("the statute of limitations for actions under New York's Human Rights Law is three years.").

[17] Although Defendants' reference is unclear, Defendants may be referring to instances where Defendants suspended Plaintiff for allegedly failing to follow established procedures applicable to submitting reports and attending briefings, falsifying official Department business records, not timely processing a prisoner whom Plaintiff had arrested, and improper conduct with female citizens in the Village. *Facts, supra*, at 7.

hostile work environment claim must fail "since each of the alleged incidents [Plaintiff] recalls with any specificity occurred more than 300 days before he filed his DHR charge." Defendants' Memorandum at 49.

Because a hostile work environment claim "is composed of a series of separate acts that collectively constitute one unlawful employment practice, it does not matter that some of the component acts fall outside the statutory time period." *National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 103 (2002) (internal quotation omitted). "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered for the purposes of determining liability." *Id.* Therefore, the court must determine which acts "are part of the same actionable hostile work environment practice" and which, if any, of those acts occurred within 300 days of Plaintiff's filing of the NYHRL claim so as to sustain all of Plaintiff's claims asserted instances of harassment constituting a hostile work environment. *Id.* As evidence of the Department's alleged hostile work environment, Plaintiff cites several instances, many of which occurred outside the statutory time period, where supervisors and coworkers made derogatory or offensive remarks to Plaintiff about Plaintiff's weight, as well as Camilleri's failure to stop Plaintiff's co-workers' harassing behavior when Plaintiff notified Camilleri of the offensive comments and caricatures. Plaintiff also contends that the Department's decision to interrogate Plaintiff on April 3, 2003, about the CPS investigation regarding Plaintiff's conduct as a parent and his relationship with his wife, and the Defendants' postponement of Plaintiff's compensation benefits, both of which took place within the statutory time period, *i.e.*, within 300 days of Plaintiff filing the initial discrimination charge against

Defendants on September 25, 2002, support his hostile work environment claim. Plaintiff's Memorandum at 32-33; Complaint ¶ 36.

The court finds that, as a reasonable trier of fact could conclude that Plaintiff's obesity as perceived by Defendants triggered Defendants' repeated abusive conduct toward Plaintiff, all of the acts Plaintiff relies on to support his hostile work environment claim which occurred outside the 300 day time period were, nevertheless, integrally connected to Plaintiff's hostile work environment claim which is actionable and thus admissible as a basis for a finding of liability on this claim. *Morgan, supra,* at 103 ("[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered for the purposes of determining liability"). Plaintiff's hostile work environment claim is not time barred "so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." *Morgan, supra*, at 122. Therefore, as Plaintiff's claim is based on instances which fall within and without the permissible statutory time period, but the frequency, severity, humiliating and offensive nature of the conduct permeated Plaintiff's workplace and are integrally connected to each other, *i.e.*, directly or indirectly relating to Plaintiff's weight and physical appearance, it is immaterial that some acts relative to the hostile work environment claim occurred outside the statutory period. *Id.* at 117. "Provided that an act contributing to the claim occurs within the filing period, the entire period of hostile work environment may be considered by a court for the purpose of determining liability." *Id.* As such, Defendants' motion for summary judgment on Plaintiff's hostile work environment claims under the ADA and NYHRL should be DENIED on this ground.

63

## **CONCLUSION**

Based on the foregoing, Defendants' motion for summary judgment (Doc. No.

105) should be GRANTED in part, and DENIED in part.


Respectfully submitted,

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      August 16 ,2007
            Buffalo, New York

Pursuant to 28 U.S.C. §636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Ordered.**

*Thomas v. Arn,* 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:        August 16, 2007
             Buffalo, New York